771 A.2d 525

**Jessie Lee YOUNG**

v.

**STATE of Maryland.**

**No. 1182, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 30, 2001.

382

Nicole Zell, Assistant Public Defender (Stephen E. Harris, Public Defender and Margaret L. Lanier, Assistant Public Defender on the brief), Baltimore, for appellant.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Frank Weathersbee, State's Attorney for Anne Arundel County, Annapolis, on the brief), for appellee.

Argued Before JAMES R. EYLER, SONNER, and J. THOMAS NISSEL (specially assigned), JJ.

JAMES R. EYLER, Judge.

Appellant, Jessie Lee Young, was convicted by a jury sitting in the Circuit Court for Anne Arundel County of transporting a person for purposes of prostitution. The circuit court sentenced appellant to ten years incarceration and suspended all but eight years. As one of the conditions of probation, the circuit court ordered appellant to register as a sexual offender.

## Questions Presented

1. Is the requirement that appellant register as a sexual offender an illegal condition of probation?
2. Did the court err in admitting irrelevant and prejudicial evidence?
3. Did the court err in admitting evidence of racial prejudice?

Finding no error, we affirm the judgment of the circuit court.

## Facts

The following is a summary of Jessica McGregor's testimony, the State's principal witness. Jessica testified that, when she met appellant in the summer of 1999, he told her that he ran an escort service, asked if she was interested in participating, and she replied in the affirmative. Appellant asked how old she was, and she stated that she was 18. Appellant replied that he knew she was lying, and she then said that she was 17. Appellant told her to say that she was 21 years old.

The next evening, appellant and Jessica discussed prostitution. Appellant took her to a "track," which is "a strip area where prostitutes ply their trade." Appellant gave her advice with respect to prostitution, including pricing information, avoiding pimps, avoiding cars with dark tinted windows, and avoiding "black men" because they were "meaner." Appellant instructed Jessica to bring him money, and he agreed to watch her every night.

At one point, appellant and Jessica went to New York City, where appellant purchased false identification for Jessica, showing that she was older than she actually was, and identifying her as "Rachel Marie Mitchell."

After meeting appellant, Jessica, who had lived with her mother, did not return. Instead, she lived with appellant in hotels and motels. Jessica told appellant that she loved him.

From September 2 through 7, 1999, appellant and Jessica were in the Washington, D.C. area. Jessica's sister, Felicia Green, age 13, stayed with them in a motel in Maryland. Felicia stayed in the motel room at night while Jessica and appellant were working the streets in Washington. Early on the second morning, Jessica was arrested by an undercover

police officer. At the police station, Jessica told an officer that her sister was in a motel room and asked them to get her. They did so. Jessica told the police about appellant, initially stating that he was a friend of the family who was taking Jessica and her sister to their mother, but later admitting that she had lied.

Jessica further testified that she was born on March 4, 1983, and that she was age 16 during the relevant time period.

## Discussion

### 1.

Appellant contends that requiring him to register as a sexual offender was an illegal condition of probation. Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), appellant argues that the requirement of registration violates his constitutional rights of due process and trial by jury.

The requirement that appellant register as a sexual offender was imposed pursuant to Maryland Code (1996, 2000 Supp.) Article 27, section 792. The relevant subsection is 792(a)(6)(vii), which defines an "offender" as one convicted of violating certain provisions of the criminal code, including section 432, "if the intended prostitute is under the age of 18 years." [1]

Appellant was convicted of violating Maryland Code (1996, 2000 Supp.) Article 27, section 432. Pursuant to that section, the court instructed the jury as follows:

Now, the crime in this case, the defendant is charged with transporting a person for prostitution. In order to convict the defendant of this charge, you must find that the defendant knowingly transported, or caused to be transported, or aided and assisted in obtaining transportation for, by any means of conveyance, through or across the State, any person for purpose of prostitution, or with the intent and

---

1. An "offender" under section 792(a)(6)(vii) must register with the supervising authority, defined in section 792(a)(13). An "offender" is to be distinguished from a "child sexual offender," a "sexually violent offender," or a "sexually violent predator," all defined and addressed by the Act. *See* § 792(a).

purpose to induce, entice, or compel the person to become a prostitute.

Appellant observes, based on that statement of the law, that the jury did not need to and did not decide the fact question of Jessica's age. Appellant concludes that, under *Apprendi*, he was entitled to have a jury resolve that issue, and because it did not, he cannot be required to register under the sexual offender statute.

In *Apprendi*, the defendant pleaded guilty to two counts of possession of a firearm for an unlawful purpose, a second-degree offense, and possession of an anti-personnel bomb, a third-degree offense. *Apprendi*, 530 U.S. 466, 120 S.Ct. at 2352. Under New Jersey law a second-degree offense is punishable by imprisonment for five to ten years, while a third-degree offense carries a term of three to five years. *Id.* For the second-degree offense, *Apprendi* was sentenced under an enhanced penalty statute that authorized imprisonment for ten to twenty years if the defendant acted with an intent to intimidate because of race, color, gender, handicap, religion, ethnicity, or sexual orientation. *Id.; see* NJ Stat. Ann. § 2C:44–3(e) (West 1995). At the sentencing hearing, the judge decided by a preponderance of the evidence that the defendant's conduct had been racially motivated, decided that the enhancement statute applied, and imposed an enhanced penalty of twelve years for one of the second-degree counts. *Apprendi*, 530 U.S. 466, 120 S.Ct. at 2352.

*Apprendi* appealed, arguing that his due process rights were violated because the basis for the enhanced penalty, intent, was not proved beyond a reasonable doubt. *Apprendi*, 530 U.S. 466, 120 S.Ct. at 2352. To support his argument, *Apprendi* relied on *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), requiring that a state prove, before a jury if elected, the elements of a criminal offense. The Supreme Court of New Jersey, relying primarily on *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), concluded that the question of *Apprendi's* intent was a

sentencing factor not requiring jury determination. *State v. Apprendi*, 159 N.J. 7, 731 A.2d 485, 494–95 (1999).

The Supreme Court of the United States reversed and held that the Sixth Amendment right to a jury trial, read in conjunction with the due process requirement in the Fourteenth Amendment, requires that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. 466, 120 S.Ct. at 2355 (quoting *Jones v. United States*, 526 U.S. 227, 243, n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)).

It appears that the word "penalty," as used by the Supreme Court in *Apprendi*, is synonymous with the word "punishment." For example, the Court stated:

If a defendant faces *punishment* beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not— at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.

*Apprendi*, 530 U.S. 466, 120 S.Ct. at 2359 (emphasis added). The Court continued by stating that a "State scheme that keeps from the jury facts that '[e]xpose [defendants] to greater or additional punishment' may raise serious constitutional concern." 530 U.S. 466, 120 S.Ct. at 2360 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). Later in the opinion, the Court again stated:

The New Jersey statutory scheme ... allows a jury to convict a defendant of a second-degree offense based on its finding beyond a reasonable doubt that he unlawfully possessed a prohibited weapon; after a subsequent and separate proceeding, it then allows a judge to impose *punishment* identical to that New Jersey provides for crimes of the first degree....

*Id.* at 2363 (emphasis added); *see also Apprendi,* 530 U.S. 466, 120 S.Ct. at 2365 ("the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater *punishment* than that authorized by the jury's guilty verdict?" (footnote omitted) (emphasis added)). Consequently, we understand the terms "penalty" and "punishment" to be essentially the same for purposes of the issue before us.

If registration under Maryland's sexual offender statute is not a penalty or punishment, it can constitutionally be considered as a "sentencing factor" and be determined by a judge. *Apprendi,* 530 U.S. 466, 120 S.Ct. at 2360; *McMillan,* 477 U.S. at 91, 106 S.Ct. 2411 (sentencing factors are facts that could influence a sentence but do not have to be found by a jury); *see also State v. Simpson,* 318 Md. 194, 198, 567 A.2d 132 (1989) (elements which increase penalty are to be determined by fact-finder not sentencing judge). The Supreme Court, in *Apprendi,* expressly limited *McMillan*'s holding to "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict. . . ." 530 U.S. 466, 120 S.Ct. at 2361, n. 13.

In *Apprendi,* the sanction for a finding of intent to intimidate was clearly punishment, *i.e.,* a greater term of imprisonment. *Apprendi,* 530 U.S. 466, 120 S.Ct. at 2352. The threshold question, in the case before us, is whether, for purposes of the Fourteenth Amendment right to due process and the Sixth Amendment right to a jury trial, taken together, the Maryland sexual offender statute is punitive in that it imposes a penalty or punishment, or whether it is regulatory. If it is not punitive, *Apprendi* does not control our decision.[2]

There are two lines of cases relevant to our inquiry. First, there are many decisions dealing with the subject of punishment in the context of various constitutional provisions. What is punishment and when is it increased? Second, there are

---

2. At oral argument, appellant's counsel stated that he was resting his appeal solely on *Apprendi* grounds.

several decisions addressing various constitutional challenges to state sexual offender statutes. These statutes have generally been upheld on the ground that they are regulatory in nature and not punitive.

New Jersey's sexual offender statute, frequently referred to as "Megan's Law," has received significant attention. In *Artway v. Attorney General*, 81 F.3d 1235 (3d Cir.1996), and *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), the United States Court of Appeals for the Third Circuit addressed the constitutionality of that statute. The New Jersey statute provided for registration by offenders and varying types of notification for different types of offenders, determined by the relative risks believed to exist with respect to each offender classification. *Artway* addressed the registration provisions and first level notification requirements. *Artway*, 81 F.3d at 1252–53. *E.B.* addressed the second and third-level notification requirements. *E.B.*, 119 F.3d at 1081.

The *Artway* Court, in addressing *ex post facto*, bill of attainder, and double jeopardy challenges, examined several Supreme Court decisions in order to determine if the statute constituted punishment. *Artway*, 81 F.3d at 1254. Among the cases analyzed were *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (suggested that actual legislative purpose is relevant in an inquiry involving an *ex post facto* and bill of attainder challenge); *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (used an objective legislative intent test, examined proportionality of fine imposed compared to the purpose of the legislation, in a double jeopardy challenge to a forfeiture); *Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (applied the *Halper* test by examining the history of civil penalties/forfeitures in comparison to their purpose in an Eighth Amendment excessive fine claim); *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (discussed deterrence and applied objective legislative intent test in a double jeopardy challenge to a "drug tax," stating that some deterrence would not render a

measure to be punishment); *California Department of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (considered the effects of a statute that decreased a prisoner's entitlement to parole eligibility hearings in an *ex post facto* challenge); and *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (held that divesting American citizenship for draft evasion or military desertion was punishment for Fifth and Sixth Amendment purposes). The *Artway* Court then synthesized from these cases a three-prong test to determine whether the statute before it was punitive in nature: (1) actual purpose, (2) objective purpose, and (3) effect. *Artway,* 81 F.3d at 1254.

In *E.B. v. Verniero,* the Third Circuit reviewed Supreme Court decisions subsequent to *Artway,* notably *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), and *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). *E.B.,* 119 F.3d at 1094–95. In *Ursery,* the Supreme Court held that civil forfeitures were not punishment for double jeopardy purposes even if the value of the property forfeited was arguably excessive as compared to the harm inflicted on the government by the conduct that gave rise to the forfeiture. In *Hendricks,* the Supreme Court upheld a Kansas statute that provided for civil commitment of "sexually violent predators," stating that it was not punishment for purposes of the *ex post facto* or double jeopardy clauses. The *E.B.* court reaffirmed the test enunciated in *Artway.* In upholding New Jersey's "Megan's Law," the Third Circuit explained that the legislative purpose of the statute was to identify potential recidivists and to alert the public when necessary for public safety and to promptly resolve incidents involving sexual abuse and missing persons. *E.B.,* 119 F.3d at 1097. The Court concluded that protecting the public and preventing crimes was a regulatory and not punitive action. Consequently, the statutory requirements were not punishment. *Id.* at 1105.

Other courts have addressed constitutional challenges to sexual offender laws and have generally upheld them, although not always with the same reasoning or with the same

synthesis of Supreme Court precedents. *See Femedeer v. Haun,* 227 F.3d 1244 (10th Cir.2000) (upheld Utah's sexual offender statute from double jeopardy and *ex post facto* challenges on ground that it was not punitive); *Cutshall v. Sundquist,* 193 F.3d 466 (6th Cir.1999) (upheld Tennessee's sexual offender statute on double jeopardy, *ex post facto,* bill of attainder, due process, equal protection, Eighth Amendment, right to travel inter-state, and right to privacy challenges on the ground that it was not punitive), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 460 (2000); *Russell v. Gregoire,* 124 F.3d 1079 (9th Cir.1997) (upheld Washington's sexual offender statute from *ex post facto,* right to privacy, and due process attack on the ground that it was regulatory and not punitive), *cert. denied,* 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998); *People v. Malchow,* 193 Ill.2d 413, 250 Ill.Dec. 670, 739 N.E.2d 433 (2000) (upheld Illinois sexual offender statute from right to privacy, due process, double jeopardy, *ex post facto,* equal protection, cruel and unusual punishment, and state constitutional challenges on ground that it was not punitive); *Roe v. Farwell,* 999 F.Supp. 174 (D.Mass. 1998) (upheld Massachusetts's sexual offender statute from *ex post facto,* Double Jeopardy, Bill of Attainder, Eighth Amendment, and Equal Protection challenges on ground that it was not punitive except for one of its notification sections, which allowed any adult to request verification of whether a person is a sex offender); *State v. Manning,* 532 N.W.2d 244 (Minn. Ct.App.1995) (upheld Minnesota's sexual offender statute from *ex post facto* challenge holding statute was regulatory and not punitive).

The challenges to sexual offender laws have generally been on bill of attainder, double jeopardy, *ex post facto,* and substantive due process grounds; but, whatever the ground, courts have generally held that such statutes are not punitive. We reach the same result in this case in the context of a Sixth Amendment challenge. The Supreme Court, in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), discussed what constitutes punishment for purposes of the protections contained in the Fifth and Sixth Amendments.

The Court stated that the factors included (1) whether the sanctions involved an affirmative disability or restraint, (2) whether it has historically been regarded as a punishment, (3) whether it comes into play only on a finding of scienter, (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence, (5) whether the behavior to which it applies is already a crime, (6) whether alternative purposes to which it may rationally be connected are assignable, and (7) whether it appears excessive in relationship to the alternative purpose assigned. *Id.* at 168–69, 83 S.Ct. 554. In *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), the Supreme Court made it clear that the *Mendoza–Martinez* factors are non-exhaustive and non-dispositive.

Courts frequently have referred to the *Mendoza–Martinez* factors in the context of an attack on sexual offender statutes, even though the attack is on other than a Fifth or Sixth Amendment ground. In *Hendricks*, the Supreme Court, in considering *ex post facto*, substantive due process, and double jeopardy challenges to Kansas's civil commitment statute for sexually violent predators, considered the *Mendoza–Martinez* factors. *Kansas v. Hendricks*, 521 U.S. 346, 362, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Similarly, the Supreme Court in *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 734, 148 L.Ed.2d 734 (2001), referred to the *Mendoza–Martinez* factors in upholding a Washington statute authorizing civil commitment for sexual violent predators. The Court held that the statute was not punishment for purposes of the *ex post facto* and double jeopardy challenges. *Id.* at 746–47.

■ The above authorities persuade us that the Maryland statutory offender statute is not punitive for due process and Sixth Amendment purposes, the relevant inquiry for purposes of determining the application of *Apprendi*. We do not need to enunciate a test for "punishment" for any and all circumstances, nor determine how such a test differs, if at all, depending on the nature of the constitutional challenge. While sexual offender statutes providing for registration and

notification differ from state to state, the Maryland statute contains the same attributes as statutes upheld by other courts against constitutional challenges, albeit not Sixth Amendment challenges. The factors relevant to Sixth Amendment challenges have been considered in challenges to such laws that were based on other constitutional provisions. As a result of our conclusion, *Apprendi* has no application to the case before us.

## 2.

Appellant contends that the circuit court erred in admitting irrelevant evidence. Appellant contends such error occurred on three separate occasions. We set forth the relevant exchanges.

### i.

During the redirect examination of Jessica, the prosecutor inquired:

[PROSECUTOR]: Why is it that you used the age 21?

[WITNESS]: So I can be released out of jail the following day.

[PROSECUTOR]: And whose idea was it that you be 21?

[WITNESS]: It was Jessie's idea.

[PROSECUTOR]: Jessica, did you want to prostitute yourself?

[DEFENSE COUNSEL]: Objection.

THE COURT: Basis? What is the basis?

[DEFENSE COUNSEL]: I don't believe that that is a relevant question.

THE COURT: Okay. Well I will let her answer.

[WITNESS]: No.

[PROSECUTOR]: Why did you?

[DEFENSE COUNSEL]: Objection, Your Honor. Again, the same grounds.

THE COURT: Okay. I will let her answer it.

[WITNESS]: I loved Jessie.

## ii.

During the direct examination of Jessica, the prosecutor inquired:

[PROSECUTOR]: After you met the defendant, did you have an opportunity to visit with your mother?

[WITNESS]: Yes.

[PROSECUTOR]: And when you were visiting with your mother, can you tell me about—

[DEFENSE COUNSEL]: I'm sorry, Your Honor; objection to this. Again, relevance to the matter at hand.

THE COURT: Is this relevant?

\* \* \*

[PROSECUTOR]: The elements of the offense are the knowing transportation of this person for the purpose of prostitution. One of the—although not an element of the crime, there is always a motive as to this crime and it is logical for the jury to ask—in this case, why did the young girl do this? Why was she involved in this?

The fact is, there is information about her family background and her relationship with her mother goes to her— answers the one question. I would proffer, Your Honor, that she has a difficult relationship with her mother. Her mother was on drugs and it wasn't—she wanted to be and therefore she was driven—I think the jury needs to know the whole story or the reason why.

[ANOTHER DEFENSE LAWYER]: Her reason for doing something is completely irrelevant to any issue of this trial.

\* \* \*

[DEFENSE COUNSEL]: The point, Your Honor, that her—and the behavior—

THE COURT: Well I am going to overrule the objection. You just limit it to that—

[PROSECUTOR]: There is—to this particular—

THE COURT: What's that?

[PROSECUTOR]: There is—particular purpose—

THE COURT: All right.

\*     \*     \*

[PROSECUTOR]: What happened when you saw your mother [when you returned home for a visit about two weeks after meeting the appellant]?

[WITNESS]: She looked really bad. She was out using heroin since I had left. She told me it was all my fault for leaving her so—

[PROSECUTOR]: What did you do for your mother?

[WITNESS]: So I gave her a bath and we ordered in some Chinese; she was hungry and everything in the house had been sold. So I brought the mattresses from upstairs down and laid them—and made a bed for her after we ate and I gave her a bath.

I told her I was leaving to back to my room and I wanted her to go to—get some sleep and to call me as soon as she woke up in the morning and I would return to her. She still really couldn't move so I gave her another bath.

We ordered in again. She ate. We talked for a little while and later on, we decided—or she decided to move to Tennessee and start over. So I helped her pack her belongings and my grandfather purchased her a ticket to go to Tennessee for that day. Later on that day, I took her to the bus station and she left.

### iii.

During the direct examination of Jessica, the prosecutor inquired:

[PROSECUTOR]: [After you were arrested in the District of Columbia,] did you tell them anything about your sister, Felicia?

[WITNESS]: Yes, I did.

[PROSECUTOR]: And what did you say?

[DEFENSE COUNSEL]: Objection, Your Honor; relevance.

THE COURT: Is this relevant?

[PROSECUTOR]: Yes, it is, Your Honor.

THE COURT: Okay. I will overrule it, subject to it being stricken. Go ahead.

[WITNESS]: I told them where my sister was, in the hotel room, and asked them to go get her.

[PROSECUTOR]: And after you told the police that—

[WITNESS]: Yes.

[PROSECUTOR]:—did you talk to—

\* \* \*

[DEFENSE COUNSEL]: I am going to continue to object on relevance grounds.

[PROSECUTOR]: Your Honor, the reason that this was reported to the Anne Arundel County Police is—to check the well-being of a 13 year old who was in this hotel room. There was an important—that Jessica testified to the fact that she made this statement which prompted the investigation and then she will talk about that's when she was interviewed by the Anne Arundel County police detectives.

[DEFENSE COUNSEL]: What about driving—

[PROSECUTOR]: Excuse me. I am—

THE COURT: Wait a minute. I don't understand—she called her sister—

[PROSECUTOR]: She told the D.C. police to check the welfare and then she—this prompted the investigation into the fact that the defendant is her pimp and that's when this whole thing opened up.

THE COURT: Well I mean, you already testified—I don't understand—

[PROSECUTOR]: I think it is important to link it all together, the fact—and it goes to her credibility, the fact that it was reported to the police and that she indicated—

THE COURT: Well she reported—her sister was in that room—

[PROSECUTOR]: Right. And then the next—

THE COURT:—

[PROSECUTOR]: The next question was going to be—did you then talk to individuals at the Anne Arundel County Police and what did you tell them? I told them about Jessie.

THE COURT:—I will overrule it.—

[PROSECUTOR]: Jessica, after reporting to the D.C. Police that your sister was still in the hotel at the Knights Inn, did you then sometime later talk to members of the police department in Anne Arundel County?

[WITNESS]: Yes, I did.

[PROSECUTOR]: And did you tell them about Jessie?

With respect to (i), appellant argues that evidence that Jessica did not want to be a prostitute and did so at appellant's request was irrelevant to the crime. With respect to (ii), appellant argues that evidence that Jessica had a difficult home life and was being poorly parented was not relevant to the crime. Finally, with respect to (iii), appellant argues that the questioning related to the course of the police investigation was irrelevant because there was no issue involving the adequacy of the investigation.

With respect to the issue in (i), we note that Jessica testified that she loved appellant on two prior occasions. The exchange, if we assume it was permitted in error, was harmless beyond a reasonable doubt. Admitting the evidence was not error, however. The admissibility of evidence lies within the sound discretion of the trial judge, and this includes determinations of relevancy. *See Ware v. State,* 360 Md. 650, 672–73, 759 A.2d 764 (2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001) (citing *Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998)); *see also Robinson v. State,* 348 Md. 104, 121, 702 A.2d 741 (1997) ("The determination of whether specific evidence is relevant in a given case rests with the trial court, and that determination will not be disturbed on appeal absent a clear abuse of discretion."). In this case, the State was entitled to present evidence that appellant knowingly transported Jessica (1) for the purpose of prostitution or (2) with the intent and purpose to induce, entice, or compel

Jessica to become a prostitute. *See* Md.Code (1996, Supp. 2000), Art. 27, § 432. We conclude that the trial court did not abuse its discretion.

■ With respect to the exchange in (ii), the information concerning Jessica and her background was relevant to appellant's intent and purpose, particularly in the earlier time period of their relationship. Again, we conclude that the trial court did not abuse its discretion.

■ With respect to (iii), the information was relevant to the connection between the motel room in Anne Arundel County and the activities in Washington to establish transporting in Anne Arundel County. Finally, we observe that the defense, at trial, was that Jessica, the State's "star witness," was lying. The challenged information was relevant to Jessica's credibility. We conclude that the trial court did not abuse its discretion.

### 3.

■ Appellant contends that the circuit court erred in admitting evidence of racial prejudice. During the direct examination of Jessica, the prosecutor inquired,

[PROSECUTOR]: What did the defendant say to you?

[WITNESS]: He didn't want me to date black men. He didn't want me to get into cars with dark tinted windows because they would be undercover most likely.

[PROSECUTOR]: Did the defendant talk to you about dates that you should have or people that you should date?

[WITNESS]: Older white men were okay to date. The Chinese were okay. The Arabians were okay.

\*     \*     \*

After the lunch break, the direct examination resumed:

[PROSECUTOR]: Jessica, you testified that there were rules that the defendant laid down about not dating black men.

[WITNESS]: Yes.

[PROSECUTOR]: Was there a reason why?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[WITNESS]: He said that they were meaner, most likely they would be the ones that would rob me or sometimes not even pay me and I just shouldn't be around them.

[DEFENSE COUNSEL]: Your Honor, I am going to object to this, Your Honor.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: You may proceed.

Relying primarily on *Eiler v. State,* 63 Md.App. 439, 492 A.2d 1320 (1985), appellant contends that the fact that appellant distrusted African–Americans and had a notion that they were mean was irrelevant to any issue in the case.

*Eiler* was a felony murder case, where the underlying felony was robbery. The State induced the defendant to describe the geographical area in question with racial slurs that had no relevancy whatsoever to the issues in the case.

In the case before us, appellant concedes that, in general, the inquiries concerning instructions given by appellant to Jessica were relevant and proper, *i.e.,* appellant objects only to the racial reference. We note that Jessica testified, without objection, that appellant did not want her to "date black men" and, in explaining appellant's instructions to her, recounted references by appellant to race and ethnicity other than the one in question. We conclude that the circuit court did not abuse its discretion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**