806 A.2d 233

Jessie Lee YOUNG

v.

STATE of Maryland.

No. 56, Sept. Term, 2001.

Court of Appeals of Maryland.

Aug. 30, 2002.

Nicole M. Zell and Margret L. Lanier, Asst. Public Defenders (Stephen E. Harris, Public Defender, on brief) Baltimore, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief) Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

Jessie Lee Young, petitioner, was ordered to register as a sexual offender after his conviction for transporting a sixteen-year-old girl for the purposes of prostitution. He challenges the registration requirement on the grounds that registration was an additional penalty that required its factual conditions precedent to be proven to a jury beyond a reasonable doubt. We granted certiorari primarily to decide whether Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 792 (current version at Maryland Code (1957, 2001 Repl.Vol.) § 11–701 *et seq.* of the Criminal Procedure Article),[1] Maryland's Registration of Offenders statute, requiring certain convicted defendants to register as sex offenders, violates due process, in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

We shall hold that *Apprendi* does not apply, because sex offender registration does not constitute punishment in the constitutional sense, as defined by the United States Supreme Court, and, therefore, the factual predicate finding by the trial court was not a fact that increased the penalty for the crime beyond the statutory maximum within the meaning of *Apprendi.*

## I.

Jessica McGregor, a sixteen-year-old girl, met petitioner, a thirty-four-year-old man in Rochester, New York in the summer of 1999. At that time, after he told her that he ran an escort service and asked if she was interested in participating,

---

1. Unless otherwise indicated, all subsequent statutory references are to Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.), Article 27, which was in effect at the time of petitioner's conviction and sentence.

she responded that she was. Petitioner then asked how old she was, and she stated that she was eighteen years old. Petitioner responded that he knew that she was lying, and she then said that she was seventeen years old. Petitioner instructed her that, if anyone asked, she should say that she was twenty-one.

The next evening, petitioner and Jessica discussed prostitution. Petitioner dressed Jessica as a prostitute, took her to a location known for prostitution, and gave her advice about prostitution, including instructions about where to go, how to act, and what to charge for her services. Petitioner further instructed Jessica to bring him the proceeds from her prostitution, and he agreed to watch over her every night. Jessica left her mother's home, where she had been living, and lived with petitioner in motels. She told petitioner that she loved him. At one point, petitioner and Jessica went to New York City, where petitioner purchased false identification for Jessica stating that her name was "Rachel Marie Mitchell" and that she was older than she actually was.

During the first week of September 1999, petitioner and Jessica came to the metropolitan Washington, D.C. area. Jessica's thirteen-year-old sister, Felicia Green, stayed with them in a motel in Laurel, Maryland. Felicia stayed in the motel room at night while petitioner took Jessica to work the streets in Washington. Early one morning, Jessica was arrested by an undercover police officer. At the police station, Jessica told an officer that Felicia was in the motel room and asked the police to retrieve her, which they did. Jessica told the police about petitioner, initially telling them that he was a friend of her family taking Jessica and Felicia to their mother, but later admitting that that was a lie, which she told because she did not want petitioner to get into trouble.

Petitioner was convicted by the jury of transporting a person for the purposes of prostitution in violation of Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 432 (repealed by 2001 Md. Laws 674, current version at Maryland Code (2001, 2001 Supp.) Article 27, § 428).[2] The maximum

---

**2.** Section 432 reads as follows:

permissible sentence under § 432 is ten years imprisonment. After conducting a sentencing hearing, the Circuit Court sentenced petitioner to a term of imprisonment of ten years, with credit for time served, all but eight years suspended. The court placed him on five years supervised probation and ordered, pursuant to § 792, that he register as a sexual offender.[3]

---

"Any person who shall knowingly transport or cause to be transported or aid or assist in obtaining transportation for, by any means of conveyance, through or across this State, any person for the purpose of prostitution, or with the intent and purpose to induce, entice or compel the person to become a prostitute, shall be deemed guilty of a felony, and upon conviction thereof shall be imprisoned for not more than ten years...."

3. The states were required by the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 (1994), to implement sex offender registration programs as a condition of federal law enforcement funding. *See* § 14071(g); *Graves v. State*, 364 Md. 329, 336, 772 A.2d 1225, 1229–30 (2001). The Wetterling Act was developed in response to national pressure to address crimes of violence and molestation committed against children in the United States. *See id.* at 336–37 n. 8, 772 A.2d at 1230 n. 8. The Wetterling Act established guidelines for registration and community notification for persons convicted of criminal offenses against minors or who were determined to be sexually violent predators. *See* § 14071; *Graves,* 364 Md. at 336–37 n. 8, 772 A.2d at 1230 n. 8. Among other things, a state must register persons convicted of certain offenses and provide the information to the FBI and local law enforcement agencies. *See* § 14071(a). Federal law requires that registration information, at a minimum, include the offender's name, fingerprints, photo, and current address. *See* § 14071(b)(1). Federal law also requires that the information be released to the extent necessary to protect the public from specific individuals. *See* § 14071(c)(2). Nonetheless, when Congress enacted the Wetterling Act, it afforded the states wide latitude in fashioning their sex offender registration statutes, leaving to the state the questions of which offenders should be the targets of disclosure, the information gathered and the extent of disclosure, and the standards and procedures, if any, to apply to these determination. *See Graves,* 364 Md. at 344, 772 A.2d at 1234; Wayne A. Logan, *Liberty Interests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws,* 89 J.Crim L. & Criminology 1167, 1174 (1999).
Presently, all fifty states, the District of Columbia, and the federal government have adopted some form of sex offender registration or community notification programs. *See Graves,* 364 Md. at 336–37 n. 8, 772 A.2d at 1230 n. 8; Logan, *supra,* at 1172.
"At present, jurisdictions use any (or some combination) of three methods of dissemination: (1) "public access," which requires com-

Petitioner noted a timely appeal to the Court of Special Appeals, which affirmed his conviction and sentence. *See Young v. State*, 138 Md.App. 380, 771 A.2d 525 (2001). The intermediate appellate court held that "the Maryland statutory offender statute is not punitive for due process and Sixth Amendment purposes ... of determining the application of *Apprendi*" and that "*Apprendi* has no application to the case before us." *Id.* at 391–92, 771 A.2d at 532.

We granted certiorari to consider whether the statute requiring that certain criminal defendants register as sexual offenders is a punitive statute that imposes a sanction and triggers the right to a jury trial and the right to proof beyond a reasonable doubt under *Apprendi*, as well as to consider two evidentiary issues. *See Young v. State*, 365 Md. 266, 778 A.2d 382 (2001).

## II. Sexual Offender Registration and Community Notification Under § 792

Section 792 defines an "offender," for the purposes of sexual offender registration, as, *inter alia*, an individual who is ordered by the court to register and who has been convicted of violating § 432, if the intended prostitute is under the age of eighteen years. *See* § 792(a)(6)(vii). The finding that a defendant qualifies as an offender subjects him or her to the registration requirements of the statute at the time of release. *See* § 792(a)(7).[4] A registrant must register with the super-

---

munity members to request information from a given jurisdiction's registry ...; (2) Internet web-site access; and (3) affirmative community notification by law enforcement, which can involve the use of informational fliers and door-to-door visits by police."

Logan, *supra*, at 1174 n. 35; *see, e.g.*, Ala.Code § 15–20–21(a)(2) (1999); § 15–20–22(a) (authorizing community notification by "flyer," which contains, *inter alia*, offense information, a photo, and the name and home address of the registrant, and which is distributed primarily by hand, posting, local newspaper, and the Internet).

4. Qualifying sexual offenders are not automatically required to register under the statute. An offender must first be ordered by the court to register under § 792. *See* § 792(a)(6). A sexually violent predator, in addition to having committed multiple sexually violent offenses, as

vising authority on or before the date that the registrant is released or is granted probation, a suspended sentence, or a sentence that does not include a term of imprisonment. *See* § 792(c)(1)(i). "Release" means any type of release from the custody of a supervising authority, including release on parole. *See* § 792(a)(8). An offender must register annually for ten years. *See* § 792(d)(5). The registrant must provide the supervising authority with a signed statement that includes his or her name, address, place of employment, Social Security number, and a description and location of the qualifying criminal conduct. *See* § 792(e).

In addition to registration requirements, the statute provides for notice to certain agencies and persons. The supervising authority must send a copy of the registration statement, the registrant's fingerprints, and a photograph of the registrant to the local law enforcement agency in the county or counties where the registrant will reside, work, or attend school. *See* § 792(f)(3). The local law enforcement agency is then required to send written notice of the registration statement to the county superintendent of schools, *see* § 792(g)(1)(ii), and the county superintendent is required to send written notice of the registration statement to any school principal that the superintendent considers necessary to protect the students of a school from a child sexual offender. *See* § 792(g)(2). The local law enforcement agency also must provide notice of a registration statement to any person if doing so is necessary to protect the public. *See* § 792(j)(7)(i). Upon written request, the supervising authority must send a copy of the registration statement to the victim of the crime for which the registrant was convicted, any witness who testified against the registrant, and any individual specified in writing by the State's Attorney. *See* § 792(j)(3)(i). Registration information may be released to the public and identifying information about registrants may be posted on the Internet.

defined by the statute, must be found to be at risk for committing a subsequent sexually violent offense. *See* § 792(a)(12).

*See* § 792(j)(6).[5] Section 792 permits the Department of Public Safety and Correctional Services to post on the Internet a current listing of each registrant's name, offense, and other identifying information. *See* § 792(j)(6). In the time period since the case *sub judice* was argued before this Court, the Department has begun to post registry information on the Internet.

The heart of petitioner's argument is that the Supreme Court's decision in *Apprendi* requires that, before a judge may order a defendant to register as a sexual offender or sexual predator, pursuant to § 792(a)(6)(vii), as a condition of probation in a criminal sentencing proceeding, a jury first must find beyond a reasonable doubt that the sex offense victim was under eighteen years of age. Petitioner argues that registration as a sexual offender is punitive.

The State contends that *Apprendi* applies only to statutory requirements that increase the maximum penalty to which a defendant is exposed and that, because the court suspended part of the maximum ten-year sentence permitted by § 432 in sentencing petitioner and granted probation, *Apprendi* is not applicable. Thus, when the maximum sentence is not enhanced, which it is not when the court suspends a portion of the sentence and grants probation, *Apprendi* is simply inapplicable. The State further argues that registration under the statute is not "punishment."

In order to follow petitioner's *Apprendi* argument, it is helpful to review the Supreme Court holding in that case. Apprendi pleaded guilty, under New Jersey law, to two counts of second degree possession of a firearm for an unlawful purpose and one count of third degree possession of an antipersonnel bomb. *See Apprendi,* 530 U.S. at 469–70, 120 S.Ct. at 2352, 147 L.Ed.2d 435. The maximum penalty for the

---

**5.** Failure to register is a separate misdemeanor. The statute provides that a registrant who knowingly fails to register or knowingly provides false information is guilty of a misdemeanor and, upon conviction, is subject to a maximum term of imprisonment of three years and a $5,000.00 fine. *See* § 792(*l*).

second degree offense was ten years imprisonment. Based on the trial judge's finding, by a preponderance of the evidence, that Apprendi acted with a racially biased purpose, the court sentenced him to twelve years imprisonment on the firearm count, pursuant to New Jersey's hate crime statute, which provided for an "extended term" of imprisonment of ten to twenty years for crimes committed with a discriminatory purpose. *See id.* at 471, 120 S.Ct. at 2352, 147 L.Ed.2d 435. The Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d 435.

The *Apprendi* Court began by tracing the common law development of the definition of elements of offenses for the purpose of the guarantees of due process and trial by jury, which entitle a defendant to have every element of the crime charged proven to a jury beyond a reasonable doubt. The Court noted that "facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Id.* at 483 n. 10, 120 S.Ct. at 2359 n. 10, 147 L.Ed.2d 435. The Court explained that: "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. at 2365, 147 L.Ed.2d 435.

In order to succeed in his challenge to the sex offender registration statute pursuant to *Apprendi*, petitioner must demonstrate three independent elements: (1) that registration under § 792 constitutes "punishment;" (2) that the factual findings predicate to the imposition of such "punishment" (in this case, that Jessica was under the age of eighteen years at the time that petitioner transported her for the purposes of prostitution) expose him to a greater penalty than the prescribed statutory maximum otherwise available; and (3) that such factual prerequisites involve facts "other than the fact of

a prior conviction." Petitioner fails on at least the first two such elements.[6]

### A. Punishment

The parties have not cited any case, nor has our research uncovered any, addressing the precise issue presented in this case, *i.e.*, whether the sex offender registration statute violates due process based on the reasoning of *Apprendi.* Challenges to the sex offender registration and notification statutes have arisen in other contexts, however. Numerous courts have discussed the issue of whether the registration and notification provisions of sex offender registration statutes, as well as civil forfeiture and restitution provisions, constitute punishment for *ex post facto*, double jeopardy, bill of attainder, and cruel and unusual punishment purposes. The overwhelming body of this judicial precedent concludes that sex offender registration under these types of statutes is not punishment for those constitutional or statutory purposes.

We begin with *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). The Supreme Court considered whether a provision of the New York Waterfront Commission Act of 1953, which barred persons who had been convicted of a felony from serving as a union official or working on the docks, was punishment for the purpose of *ex post facto* analysis. Justice Frankfurter, writing for the Court, explained that, in ascertaining whether a particular regulation that results in negative consequences for an individual for prior conduct constitutes an *ex post facto* law, the determinative question is "whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a

---

**6.** Because we shall determine that sexual offender registration pursuant to § 792 does not constitute punishment and that the factual findings made pursuant to the statute do not expose petitioner to a penalty beyond the maximum already prescribed, *see infra* p. 34, we need not reach the question of whether such findings fit into *Apprendi*'s exception for the fact of prior conviction.

regulation of a present situation." *Id.* at 160, 80 S.Ct. at 1155, 4 L.Ed.2d at 1120.[7]

In *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Supreme Court outlined the factors to be considered, absent conclusive evidence of congressional intent as to the penal nature of the statute, in determining whether a statute is punitive for the purposes of determining whether criminal prosecution safeguards are required. The Court considered: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter;* (4) whether its operation will promote the traditional aims of punishment— retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether it lacks an alternative purpose to which it rationally may be connected; and (7), if such alternative does exist, whether the statute appears excessive in relation to it. *Id.* at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d 644.

In *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Court held that the Excessive Fines Clause of the Eighth Amendment applied to statutory *in rem* civil forfeitures of conveyances and real property used to facilitate the possession and distribution of controlled substances. The Court reasoned that the question of whether the Eighth Amendment applied to a forfeiture did not hinge on whether it was civil or criminal, but rather whether it was "punishment." *Id.* at 610, 113 S.Ct. at 2806, 125 L.Ed.2d 488. The key inquiry was whether the forfeiture could "only be explained as serving in part to punish." *Id.* After tracing the historical development of *in rem* forfeiture, the Court conclud-

---

7. Article I, § 10 of the United States Constitution provides that "no state shall . . . pass any . . . ex post facto Law." Under the *Ex Post Facto* Clause, the government may not apply a law retroactively that "inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (emphasis deleted). *See Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 895, 137 L.Ed.2d 63 (1997).

ed that it constituted punishment because it served, at least in part, to punish the owner of the property, served punitive and deterrent purposes, and imposed an economic penalty. *Id.* at 618, 113 S.Ct. at 2810, 125 L.Ed.2d 488.

In light of the historical understanding of forfeiture as punishment, the clear focus of the statutory provisions on the culpability of the owner, and the evidence that Congress understood the provisions as serving to deter and punish, the Court was unable to conclude that the forfeiture statutes served solely a remedial purpose and found that they were subject to the limitations of the Excessive Fines Clause. *Id.* at 621–22, 113 S.Ct. at 2812, 125 L.Ed.2d 488. As Justice Scalia explained, in his concurring opinion, the purpose of *in rem* forfeitures "is not compensatory, to make someone whole for injury caused by unlawful use of the property. Punishment is being imposed. . . ." *Id.* at 625, 113 S.Ct. at 2813, 125 L.Ed.2d 488 (Scalia, J., concurring in part and concurring in the judgment) (internal citations omitted).

In *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), the Supreme Court considered the question of whether a tax on the possession of illegal drugs assessed after the state had imposed a criminal penalty and civil forfeiture for the same conduct had punitive characteristics such that it violated the Double Jeopardy Clause of the Fifth and Fourteenth Amendments.[8] *Id.* at 769, 114 S.Ct. at 1941, 128 L.Ed.2d 767. The Court modified the prohibition in *Austin* that, in order not to

---

**8.** The Double Jeopardy Clause of the Fifth Amendment provides: "Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The purpose of the Double Jeopardy Clause is to prevent successive punishments and prosecutions. *See United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 2855, 125 L.Ed.2d 556 (1993); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The protection against multiple punishments prohibits the government from criminally punishing an individual twice for the same offense. *See Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997); *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938).

be construed as punitive, a statute could not have any deterrent purpose. *Id.* at 780, 114 S.Ct. at 1946, 128 L.Ed.2d 767. Nonetheless, the Court concluded that, because the drug tax was assessed at a remarkably high rate, had a clear deterrent purpose, was conditioned on the commission of a crime, was exacted only after the taxpayer had been arrested for the precise conduct that gave rise to the tax obligation in the first place, was imposed by the same sovereign that criminalized the activity, and was levied on goods that no longer existed and the taxpayer never lawfully possessed, the tax was "too far removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purposes of double jeopardy analysis." *Id.* at 783, 114 S.Ct. at 1948, 128 L.Ed.2d 767.

In *California Department of Corrections, v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the Supreme Court held that application of an amendment to the State of California parole procedures that allowed the Board of Prison Terms to decrease the frequency of parole suitability hearings to prisoners who committed their crimes prior to its enactment did not violate the *Ex Post Facto* Clause. *See* U.S. CONST. art I, § 10; *Morales,* 514 U.S. at 501–02, 115 S.Ct. at 1599, 131 L.Ed.2d 588. In examining whether the amendment increased the "punishment" attached to the respondent's crime, the Court recognized that the standard for determining whether an enhancement to the measure of criminal punishment falls within the *ex post facto* prohibition was whether the legislative change "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Morales,* 514 U.S. at 507 n. 3, 115 S.Ct. at 1602 n. 3, 131 L.Ed.2d 588. In doing so, the Court shifted the "punishment" inquiry from the law's purpose to its effect and established that the appropriate "punishment" analysis was flexible and context-dependent. *Id.* at 509, 115 S.Ct. at 1603, 131 L.Ed.2d 588.

The Court concluded that the California parole amendment did not change the available range of sentences for second degree murder and left unchanged the substantive formula for securing any reductions to the sentencing range; it simply

altered the method to be followed in fixing a parole release date under identical substantive standards, and therefore did not constitute retroactive punishment. *Id.* at 507, 115 S.Ct. at 1602, 131 L.Ed.2d 588. Because the amendment created "only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," the Court concluded that "such conjectural effects" were insufficient to trigger the *Ex Post Facto* Clause. *Id.* at 509, 115 S.Ct. at 1603, 131 L.Ed.2d 588.

In *State v. Jones,* 340 Md. 235, 666 A.2d 128 (1995), we considered whether suspension of a driver's license constituted punishment under federal or state double jeopardy law. After examining the recent Supreme Court decisions in *Austin* and *Kurth Ranch,* we held that the temporary administrative suspension of a driver's license of a driver who is under reasonable suspicion of driving while intoxicated or under the influence of alcohol, who refuses to take a blood alcohol test or who takes a test and has a blood alcohol concentration of .10 or more, was not punishment. *Id.* at 240, 666 A.2d at 130.

We determined that the central question for the application of the Double Jeopardy Clause of the Fifth Amendment, as incorporated through the Fourteenth Amendment, was whether the application of administrative driver's license suspension could " 'fairly' be said only to serve a non-punitive purpose." *Id.* at 250, 666 A.2d at 135. We outlined three "axes" for making this determination: first, the historical context of the statute—whether license suspensions had been generally understood as punitive or non-punitive; second, an examination of the language, structure, and legislative intent of the statute in order to determine whether the statute had a purpose that was different from the historical understanding given to similar statutes; and third, if the statute served both punitive and non-punitive purposes, whether the non-punitive purposes alone could fairly justify the sanction imposed. *Id.*

After examining the common understanding of license revocations, we found that license suspensions generally served remedial purposes based on the general purpose of licensing

systems to protect the public from unscrupulous or unskilled operators who would otherwise engage in the licensed activity. *Id.* at 251, 666 A.2d at 136. Next, we examined the administrative suspension statute itself and found nothing in the language or structure to demonstrate that it served a purpose different from the typical remedial purpose of removing potentially dangerous drivers from the highways. *Id.* at 254, 666 A.2d at 137. We examined the legislative history and found that the Legislature intended that the administrative license suspension provisions serve both punitive and remedial purposes. *Id.* at 259–62, 666 A.2d at 139–41. Finally, we determined that the administrative suspension could be justified solely by the remedial purposes served by the statute, without need for the portion of the license suspension that was "punishment." *Id.* at 265–66, 666 A.2d at 142–43.[9]

In *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), the Supreme Court held that *in rem* civil forfeitures of property connected to criminal activity were neither "punishment" nor criminal for the purposes of the Double Jeopardy Clause. *Id.* at 292, 116 S.Ct. at 2149, 135 L.Ed.2d 549. The Court reasoned that, historically, *in rem* civil forfeiture was a remedial civil sanction distinct from potentially punitive *in personam* civil penalties, such as fines. *Id.* at 278–79, 116 S.Ct. at 2142, 135 L.Ed.2d 549. The Court emphasized that the question of whether a particular civil fine was punishment required a case-specific inquiry into whether the fine was so extreme and disproportionate in comparison to the government's damages that it had to be considered punitive. *Id.* at 277–78, 116 S.Ct. at 2142, 135 L.Ed.2d 549.

The Court outlined a two-part test for determining whether civil forfeitures were punitive for the purposes of the Double Jeopardy Clause: (1) whether Congress intended the proceed-

---

9. We found it unnecessary to decide whether Maryland's common law prohibition against double jeopardy would be controlled by the same analysis because, to the extent that the Legislature intended administrative license suspension to be punitive, it could override the common law double jeopardy protection by statute. *See State v. Jones,* 340 Md. 235, 266, 666 A.2d 128, 143 (1995).

ings to be criminal or civil and (2) whether the proceedings are so punitive in fact that, despite congressional intent, they could not legitimately be viewed as civil in nature. *Id.* at 288, 116 S.Ct. at 2147, 135 L.Ed.2d 549. The Court concluded that "[t]here is little doubt that Congress intended these forfeitures to be civil proceedings," based on the procedural mechanisms established for enforcing forfeitures under the statutes and the *in rem* nature of the proceedings. *Id.* at 288–89, 116 S.Ct. at 2147, 135 L.Ed.2d 549. The Court found that the required "clearest proof" that the statutes were "so punitive in form and effect as to render them criminal despite Congress' intent to the contrary" was lacking. *Id.* at 290, 116 S.Ct. at 2148, 135 L.Ed.2d 549. The Court based that finding on the fact that, while the statutes may have had certain punitive aspects, they also served important nonpunitive goals; that *in rem* civil forfeiture was not historically regarded as punishment as that term is understood under the Double Jeopardy Clause; and that there is no *scienter* requirement in the statute. *Id.* at 291–92, 116 S.Ct. at 2149, 135 L.Ed.2d 549. The Court concluded that the mere fact that the statutes were tied to criminal activity was insufficient to render them punitive. *Id.* at 292, 116 S.Ct. at 2149, 135 L.Ed.2d 549.

In *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Supreme Court considered whether Kansas' Sexually Violent Predator Act, which establishes procedures for the civil commitment of persons who are likely to engage in "predatory acts of sexual violence" due to a "mental abnormality" or a "personality disorder" violated the Double Jeopardy or *Ex Post Facto* Clauses of the federal Constitution. *Id.* at 350, 117 S.Ct. at 2076, 138 L.Ed.2d 501. In rejecting Hendricks' constitutional claims, the Court held that the Act did not establish criminal proceedings and that involuntary commitment pursuant to the statute was not punitive. *See id.* at 369, 117 S.Ct. at 2085, 138 L.Ed.2d 501. Although the Court recognized that a civil label on a statute is not always dispositive, the Court would "reject the legislature's manifest intent only where a party challenging the statute provide[d] 'the clearest proof' that 'the statutory scheme [was]

so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Id.* at 361, 117 S.Ct. at 2082, 138 L.Ed.2d 501 (citations omitted). In those limited circumstances, the Court noted, the statute would be considered as having established criminal proceedings for constitutional purposes. *See id.*

In determining whether confinement under the Kansas Act constituted punishment, the Court initially sought to ascertain, as a matter of statutory construction, whether the legislature had intended the Act to create civil or criminal proceedings, concluding, based on the placement of the Act within the probate (rather than criminal) code and its description of the Act as creating a civil commitment proceeding, that "[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm." *Id.* at 361, 117 S.Ct. at 2082, 138 L.Ed.2d 501.

The Court examined the *Mendoza–Martinez* factors in concluding that the Kansas Act was not punitive. First, the Court stressed that commitment under the Act did not "implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Id.* at 361–62, 117 S.Ct. at 2082, 138 L.Ed.2d 501. Second, the Court pointed out that, unlike a criminal statute, the Act did not require a finding of *scienter* to commit an individual who was found to be a sexually violent predator. *See id.* at 362, 117 S.Ct. at 2082, 138 L.Ed.2d 501. Third, the Court acknowledged that the civil commitment scheme involved an affirmative restraint, but concluded that, given the legitimate nonpunitive governmental objective of protecting the public from the dangerously mentally ill, the mere fact that a person is detained did not lead to the *per se* conclusion that the state has imposed punishment. *See id.* at 363, 117 S.Ct. at 2083, 138 L.Ed.2d 501. Fourth, the Court found that the duration of confinement was linked to the stated nonpunitive purposes of the commitment—namely, to hold the individual until the mental abnormality no longer caused a threat to others. *See id.* Fifth, the Court found that Kansas' use of procedural protections traditionally found in

criminal trials, designed to narrow the class of dangerous individuals, did not transform the civil commitment proceeding into a criminal prosecution. *See id.* at 364, 117 S.Ct. at 2083, 138 L.Ed.2d 501. Finally, the Court found that the Act's failure to offer any treatment for Hendricks' pedophilia did not render it punitive, since incapacitation was a legitimate end of the civil law. *See id.* at 365–66, 117 S.Ct. at 2084, 138 L.Ed.2d 501. Ultimately, the Court concluded:

> "Where the State has 'disavowed any punitive intent'; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent."

*Id.* at 368–69, 117 S.Ct. at 2085, 138 L.Ed.2d 501.

■ Appellate courts in other jurisdictions have concluded that similar sex offender registration and notification statutes do not constitute punishment. For example, in *Artway v. Attorney General of State of New Jersey,* 81 F.3d 1235 (3d Cir.1996), the United States Court of Appeals for the Third Circuit considered the question of whether the registration requirements of New Jersey law constituted "punishment" under the *Ex Post Facto,* Bill of Attainder,[10] and Double Jeopardy Clauses of the United States Constitution. *See id.* at 1253. After an extensive examination of Supreme Court precedent, the court derived a three-pronged analysis for determining whether a particular measure constitutes punishment: (1) its actual purpose; (2) its objective purpose; and (3)

---

**10.** The Constitution forbids states to "pass any Bill of Attainder." U.S. Const. art. I, § 10. Under the Bill of Attainder Clause, legislatures are forbidden to enact "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Brown,* 381 U.S. 437, 448–49, 85 S.Ct. 1707, 1715, 14 L.Ed.2d 484 (1965).

its effect. *See id.* at 1263. The second prong, the objective purpose of the statute, in turn had three subparts: (1) whether the law could be explained solely by a remedial purpose; (2) whether historical analysis shows that the measure has traditionally been regarded as punishment; and (3), if the legislature intended the law serve some mixture of punitive and nonpunitive purposes, whether the historically punitive purpose is a necessary complement to its nonpunitive operation and whether the law operates in a manner consistent with its historically mixed purposes. *See id.*

Applying the three-part test, the court determined, first, that the legislative history of New Jersey's sex offender registration law indicated that it was not intended to be punitive. *See id.* at 1264. Second, turning to the objective purpose inquiry, the court found that registration was reasonably related to the legitimate remedial purpose of law enforcement vigilance, that it was not historically understood as punishment, and that, because it historically was a regulatory technique with a remedial purpose, any incidental deterrent purpose to deter future offenses by past sex offenders would not invalidate it. *See id.* at 1264–66. Third, the court found that, while there "doubtless are some unpleasant consequences of registration," it was not so harsh as a matter of degree that it constituted punishment. *Id.* at 1267.

In *Russell v. Gregoire,* 124 F.3d 1079 (9th Cir.1997), the United States Court of Appeals for the Ninth Circuit considered the constitutionality of Washington's sex offender registration and notification statute, the Community Protection Act. *See id.* at 1081. In order to determine whether the Act violated the *Ex Post Facto* Clause, the court principally had to determine whether the registration and notification provisions imposed "punishment." *See id.* at 1083.

The Court applied the *Ursery–Hendricks* "intent-effects" test to determine whether the registration and notification requirements imposed punishment, a two-part inquiry "whether (1) the legislature intended the sanction to be punitive, and (2) the sanction is 'so punitive' in effect as to prevent the court

from legitimately viewing it as regulatory or civil in nature, despite the legislature's intent." *Id.* at 1087. In applying the "intent-effects" test, the court looked first at the language of the statute to attempt to discern the legislature's intent, finding the statute to be regulatory, rather than punitive, based on its introductory recital of purpose and its structure and design solely to monitor the whereabouts of the offender without any restraints on movement. *See id.* at 1087–88, 1090. Moving to the second part of the test, the court found that the petitioners had not provided clear proof that the sanction was so punitive in effect that it overcame the nonpunitive legislative intent. *See id.* at 1088.

The court considered the *Mendoza–Martinez* factors and concluded that they also did not support a finding that registration had a punitive effect, concluding: "no affirmative restraint or disability [was] imposed; registration [was] typically and historically a regulatory measure; it [did] not have a retributive purpose but [did] have legitimate nonpunitive purposes; and it [was] not excessive given the state interest at stake." *Id.* at 1089; *see also State v. Noble,* 171 Ariz. 171, 829 P.2d 1217, 1224 (1992); *Doe v. Pataki,* 120 F.3d 1263 (2d Cir.1997); *State v. Costello,* 138 N.H. 587, 643 A.2d 531, 533 (1994); *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367 (1995). In applying the *Mendoza–Martinez* factors to the community notification provisions, the court acknowledged that, although notification did serve the goal of deterrence, that was not sufficient to deem it punitive, since it was not retributive and did not require a finding of *scienter. See Russell,* 124 F.3d at 1091. The court also found the potential stigma of community notification insufficient to render it punishment, particularly since the statute lacked the intent to punish. *See id.* at 1092. The court rejected the argument that the potential results of threats, ostracism, harassment, and vigilantism due to community notification constituted an affirmative disability or restraint. *See id.*

In *Cutshall v. Sundquist,* 193 F.3d 466 (6th Cir.1999), the United States Court of Appeals for the Sixth Circuit considered whether the Tennessee Sex Offender Registration and

Monitoring Act, TENN.CODE. ANN. § 40–39–103 (1994), which requires sex offenders to register with law enforcement agencies and allows law enforcement officials to disseminate registry information to the public when necessary, violated the Double Jeopardy, *Ex Post Facto,* Bill of Attainder, Due Process, or Equal Protection Clauses, the Eighth Amendment, the constitutional right to interstate travel, and the constitutional right to privacy. *See Cutshall,* 193 F.3d at 469. The court held that the sex offender registration and notification act did not constitute punishment for the purposes of the Double Jeopardy, *Ex Post Facto,* or Bill of Attainder Clauses, or for the purpose of the Eighth Amendment. *See id.* at 476–78, 482–83.

The court began by examining the Act's purpose, looking primarily to its language. *See id.* at 474. The court found, given that the requirements of the reporting provisions were minimal, that there was no indication in the statutory scheme that the legislature intended the Act to have anything other than the regulatory purpose of monitoring the whereabouts of convicted sex offenders. *See id.* After finding no punitive purpose based on the language of the Act, the Court next examined the effects of the law, applying the *Mendoza–Martinez* factors to determine if it was punitive in the sense that it punished a registrant twice for the same offense in violation of the Double Jeopardy Clause, *see id.* at 474–76, or increased the onerousness of punishment for crimes already committed in violation of the *Ex Post Facto* Clause. *See id.* at 476–77.

First, the court found that the Act imposed no affirmative restraints on registrants. *See id.* at 474. Second, the court found that the mere dissemination of registry information has not been viewed as punishment from a historical perspective. *See id.* at 475. Third, the court found that the Act did not "come into play 'only' on a finding of scienter." *Id.* In examining the fourth factor, the court conceded that it was "clear that the Act w[ould] serve to promote deterrence," *id.,* but found that a deterrent purpose alone was not sufficient to make the Act punitive. *See id.* at 475–76. In applying the

fifth factor, the court conceded that the Act applied only to behavior that already was a crime, but concluded that, since registration and notification imposed no significant additional penalty, the criminality element did not transform the Act from one that was regulatory to one that was punitive. *See id.* at 476. Sixth, the court considered whether there was a remedial purpose behind the Act and whether the Act was excessive in relation to that purpose; the court concluded that the gravity of the regulatory purpose of protecting the public from sex offenders outweighed the minimal burdens imposed on registrants. *See id.* The court also concluded that the Act did not violate the Bill of Attainder Clause, since gathering and disseminating information was not a traditional form of punishment and since the Act served legitimate regulatory purposes and was not intended to serve as punishment. *See id.* at 477.

In *Femedeer v. Haun,* 227 F.3d 1244 (10th Cir.2000), the United States Court of Appeals for the Tenth Circuit considered whether Utah's sex offender notification scheme violated the Double Jeopardy and *Ex Post Facto* Clauses when applied to offenders who committed crimes prior to the effective date of the legislation. *See id.* at 1246. In considering Femedeer's *ex post facto* challenge, the court addressed the threshold inquiry of whether Utah's Internet notification program, requiring registration for crimes previously committed by those subject to its provisions, constituted additional criminal punishment. *See id.* at 1248. The court found that the intent of the Utah Legislature, in enacting the statute allowing for Internet notification, clearly was to establish a civil remedy. *See id.* at 1249. The court noted that the statute was placed in the civil code rather than the criminal code, contained an unambiguous statement of purpose to assist in investigating and apprehending sexual offenders, and was supported by the legislative history of the statute. *See id.*

The court then looked to see whether there was the "clearest proof" that the notification scheme was so punitive in purpose or effect as to overcome the legislature's civil intent. *See id.* In doing so, the court applied the *Mendoza–Martinez*

factors, finding: that the notification program did not "work an affirmative disability or restraint in the sense traditionally associated with punishment," *id.* at 1250; that public accessibility of information concerning a sex offender's conviction was not historically regarded as punishment, *see id.;* that the notification requirements were not triggered solely on a finding of *scienter, see id.* at 1251; that the statute furthered the civil purposes of deterrence and that the mere existence of additional negative consequences for sex offenders did not render it criminal punishment, *see id.* at 1252; that, while there clearly was a connection between notification and criminal behavior, that factor deserved only limited weight in light of the equally strong connection between notification and legitimate civil purposes, *see id.* at 1252–53; that the legitimate civil goals of deterrence, avoidance, and investigation were rationally connected to sex offender registration and notification, *see id.* at 1253; and that, given the considerable assistance that notification would offer in the prevention, avoidance, and investigation of sexual crimes, the notification scheme was not excessive in relation to its legitimate purpose. *See id.* The court also concluded that sex offender notification did not constitute punishment for the purposes of the Double Jeopardy Clause. *See id.* at 1254.

In *People v. Malchow,* 193 Ill.2d 413, 250 Ill.Dec. 670, 739 N.E.2d 433 (2000), the Illinois Supreme Court examined the constitutionality of the Illinois Sex Offender Registration Act and Sex Offender and Child Murderer Community Notification Law. *See id.* at 436. In considering the defendant's *ex post facto* challenge and whether the provisions of the registration and notification statute constituted punishment, the court first considered the legislative intent behind registration and notification. The court found the legislative intent to be protection of the public rather than punishment of sex offenders. *See id.* at 438. The court next examined the effects of the acts, noting that, even if the legislature's intent was not punitive, such intent would be disregarded where it could be shown by "the clearest proof" that the statute's effect was so punitive that it negated the legislature's intent. *See id.* at 439.

The court examined the *Mendoza–Martinez* factors and concluded that they weighed clearly in favor of the conclusion that the effect of notification was not so punitive that it defeated the legislature's intent. *See id.* The court found that the law did not place an affirmative disability or restraint on sex offenders; community notification was not traditionally regarded as punishment; the notification law had no *scienter* requirement; the statute's purpose was protection of the public and it did not significantly promote either retribution or deterrence; the purpose of the law was protection of the public rather than punishment; and the provisions of the notification law were not excessive in relation to the goal of protecting the public from sex offenders. *See id.* at 439–40. The court also found that registration and notification did not constitute punishment for the purposes of the Eighth Amendment prohibition against cruel and unusual punishment, the Illinois constitution's requirement of proportional punishment, or double jeopardy. *See id.* at 440–42.

Particularly instructive is the recent decision of the United States Court of Appeals for the Seventh Circuit in *United States v. Behrman,* 235 F.3d 1049 (7th Cir.2000). In that case, Behrman maintained that the restitution that he was ordered to pay pursuant to a plea agreement with the government violated due process because it was based on facts that were not established to a jury's satisfaction beyond a reasonable doubt based on *Apprendi. See id.* at 1051. In rejecting that argument, the court concluded that *Apprendi* did not apply because restitution was a civil remedy included within the criminal judgment, not a " 'penalty for a crime,' " and, therefore, its predicate facts did not have to be established beyond a reasonable doubt. *Id.* at 1054.

■ In order to determine whether Maryland's sex offender registration statute constitutes punishment for the purposes of *Apprendi's* due process requirements, we will apply the two-part *Ursery–Hendricks* "intent-effects" test.[11] In or-

---

11. We are aware that *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), was a double jeopardy case and that

der to determine legislative intent, we look to the declared purpose of the Legislature, as well as the text and structure of the statute. As enacted, § 792 contained no express statement of purpose. Although it was placed within Article 27 and recodified in the Criminal Procedure Article, its location within the criminal procedure laws does not necessarily indicate an intent on the part of the General Assembly to *punish* sex offenders. Forfeiture, restitution, and criminal injuries compensation were also located in Article 27 and were retained in the Criminal Procedure Article. Therefore, in examining the purpose of the statute, we look primarily to the plain language. With respect to the determination of legislative intent, we conclude that the plain language and overall design of § 792 clearly indicate that it was not intended as punishment, but rather was intended as a regulatory requirement aimed at protection of the public. There is no indication in the statutory scheme that the General Assembly intended registration or notification as a device to punish convicted sex offenders. Unlike many other states, Maryland did not enact a law for the involuntary commitment of sexually violent offenders, which would carry far more serious burdens than registration. *See, e.g.,* KAN. STAT. ANN. § 59–29a01 (1994).

Furthermore, a reading of § 792 demonstrates that its intent was not to stigmatize or shame sex offenders. Rather, the registration provisions are tailored to protect the public, requiring registrants to supply basic information to apprise law enforcement officials about an offender residing or working in the area. Registration information is disseminated to local county school superintendents, school principals, and municipal police departments. *See* § 792(g).

Nonetheless, under the *Ursery–Hendricks* "intent-effects" test, even if the General Assembly's intent was not to create a

*Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), involved both double jeopardy and *ex post facto* claims. Nonetheless, we see no reason why we should not apply the same test for guidance in determining whether § 792 constitutes punishment for the purposes of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

punitive scheme, we must examine whether there is "clearest proof" that the statute is so punitive, in either purpose or effect, that it overrides the Legislature's remedial purpose. *See Hendricks*, 521 U.S. at 361, 117 S.Ct. at 2082, 138 L.Ed.2d 501; *Ursery*, 518 U.S. at 290, 116 S.Ct. at 2148, 135 L.Ed.2d 549. In making the determination of whether § 792 has a punitive effect despite its regulatory intent, we look to the *Mendoza–Martinez* factors for guidance. *See supra* p. 698, 806 A.2d at 240.

The first and fifth factors appear to weigh in petitioner's favor. We agree with the State that the physical restraints placed by the statute upon offenders are minimal. Petitioner's movements and activities are not restricted in any way. The focus of § 792 is not on circumscribing the movement of offenders, but on keeping law enforcement and school officials informed of their location. A registrant need only notify the supervising authority of any change of address upon moving. Furthermore, the information required to be divulged in registering is not unreasonably burdensome—a registrant must provide name, address, local place of employment and/or educational enrollment, description of the crime, date of conviction, aliases, and Social Security number. *See* § 792(e).

Nonetheless, sexual offender registration imposes other affirmative disabilities on registrants, particularly in light of the community notification provisions of § 792. Being labeled as a sexual offender within the community can be highly stigmatizing and can carry the potential for social ostracism. In the case of sexually violent predators, the registration statements may include documentation of highly personal, confidential, and ordinarily nonpublic information such as treatment received for a mental abnormality or personality disorder. *See* § 792(e)(2)(iv). Therefore, § 792 does impose an affirmative burden or restraint on registrants, and this factor weighs in petitioner's favor, although we ultimately conclude that the burden is not so unreasonable, in light of the statute's remedial aims, that it converts the statute into a punitive one.

In addition, § 792 clearly applies to past criminal conduct, although this factor alone is not sufficient to render a regulatory statute punitive. *See Hendricks,* 521 U.S. at 362, 117 S.Ct. at 2082, 138 L.Ed.2d 501; *see also Ursery,* 518 U.S. at 292, 116 S.Ct. at 2149, 135 L.Ed.2d 549 (finding the fact that forfeiture was tied to criminal activity "insufficient to render the statutes punitive"); *United States v. Newman,* 144 F.3d 531, 541 n. 10 (7th Cir.1998) (finding that the fact that restitution under the Victim and Witness Protection Act applies to conduct that is already a crime insufficient to overcome the other balancing factors). There are many occasions when legislatures attach both criminal and civil sanctions to the same act or omission. The fact that the statute is triggered by a criminal conviction does not undermine the Legislature's intent to create a sex offender registry to aid in the civil purpose of tracking the location of known sex offenders. The same is true as to restitution. Thus, although the connection between sex offender registration and past criminal behavior is clear, we accord only limited weight to this factor in light of the equally strong connection between registration and legitimate civil purposes.

Ultimately, an examination of the remaining *Mendoza–Martinez* factors convince us that § 792 is not so punitive a statute in its effect that its application defeats the Legislature's remedial intent. Sex offender registration traditionally has not been regarded as punishment. While the various sex offender registration statutes do not have a precisely identical historical antecedent, registration is typically and historically a regulatory measure with a remedial purpose. Section 792 does not punish simply because it works a detriment on petitioner. Dissemination of information about criminal activity always has held the potential for substantial negative consequences for those involved in that activity, but dissemination of such information in itself has not historically been regarded as punishment when done in furtherance of a legitimate government interest. *See E.B. v. Verniero,* 119 F.3d 1077, 1099–1100 (3d Cir.1997).

Section 792 has no *scienter* requirement. Registration requirement provisions are triggered when the offender is released into the community. Section 792 applies to individuals convicted of any of the enumerated offenses, without regard to the offender's state of mind. Furthermore, not all of the predicate crimes have a *scienter* requirement. Accordingly, § 792 is not triggered by a finding of *scienter*.

The fourth *Mendoza–Martinez* factor, whether the statute promotes the traditional aims of punishment, is more complicated. Since we have concluded that the General Assembly's intent in enacting § 792 was to protect the public from sex offenders, registration could hardly be characterized as "retribution." Nonetheless, it is possible that § 792 promotes deterrence. Even an obvious deterrent purpose, however, does not make the law punitive, in as much as deterrence can serve both civil and criminal goals. *See Ursery*, 518 U.S. at 292, 116 S.Ct. at 2149, 135 L.Ed.2d 549; *Kurth Ranch*, 511 U.S. at 780, 114 S.Ct. at 1946, 128 L.Ed.2d 767. Thus, the fact that the registration scheme attaches additional negative consequences to the commission of sex offenses does not alone render it criminal punishment.

Section 792 has a legitimate purpose other than punishment. As we concluded *supra*, the statute indicates, on its face, that its purpose is protection of the public. The statute has strong remedial aspects and serves the important nonpunitive goal of alerting law enforcement and the community to the presence of sexual predators who may reoffend.

Perhaps most significantly for the purposes of our analysis, § 792 is not excessive in relation to its remedial purpose, particularly given the state interest at stake in preventing repetition of sex offenses. The provisions of § 792 are tailored narrowly to effectuate the goal of protection of the public from sex offenders. The statute provides for compilation and distribution of sex offender registration information, and the registration requirements apply only to those people who qualify as sex offenders under the statute.

■ In sum, after considering and weighing all of the relevant factors, we conclude that petitioner has failed to satisfy his burden to demonstrate that § 792 has an effect so punitive that the General Assembly's intent to create a remedial scheme may be disregarded. We agree with those courts that have found that sex registration and notification statutes are not punishment in the constitutional sense. Accordingly, we hold that requiring petitioner to register as a sex offender, pursuant to § 792, does not constitute punishment, but is a remedial requirement for the protection of the public.

## B. Increased Penalty

■ Even assuming, *arguendo*, that sexual offender registration constituted punishment for the purposes of our *Apprendi* analysis, the requisite statutory predicate that Jessica was under eighteen years of age at the time of petitioner's crime is not a "fact that increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d 435. *Apprendi* applies only to facts that increase the maximum sentence to which a defendant is exposed. *See Harris v. United States,* —— U.S. ——, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (holding, in the context of the federal sentencing factor of brandishing a pistol, that facts that increased the mandatory minimum sentence without extending the sentence beyond the statutory maximum did not have to be found by a jury beyond a reasonable doubt pursuant to *Apprendi* ). Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 432 authorizes a maximum sentence of ten years imprisonment. In sentencing petitioner, the trial court sentenced petitioner to ten years, but suspended two years of the sentence and ordered that he register as a sex offender as a condition of probation. *Apprendi* does not apply to a case in which the trial court imposes a discretionary sentence within the permissible statutory range.

*Behrman* also supports this second holding. In that case, the United States Court of Appeals for the Seventh Circuit found that the federal statute allowing for the restitution

order did not include a " 'statutory maximum' that could be 'increased' by a given finding." *Behrman,* 235 F.3d at 1054. As the Court of Appeals explained: "A civil remedy included with a criminal judgment does not make it a 'penalty for a crime' that must be established beyond a reasonable doubt.... Put otherwise, *Apprendi* does not affect the operation of the Sentencing Guidelines; it is limited to situations in which findings affect *statutory* maximum punishment." *Id.*

Contrary to petitioner's argument, the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Promise,* 255 F.3d 150 (4th Cir.2001) is inapposite to the present case. In *Promise,* the court concluded that *Apprendi* required that a jury must find possession of the specific threshold drug quantity beyond a reasonable doubt in order for a defendant to be sentenced for an aggravated drug trafficking offense because the drug quantity finding subjected the defendant to a sentence exceeding the maximum otherwise allowable. *Id.* at 152. As the court explained:

> "*[T]he maximum penalty* that may be imposed upon a defendant is *the maximum penalty* allowed by statute upon proof of only those facts alleged in the indictment and found by the jury beyond a reasonable doubt. Once this maximum penalty is established, a fact (sentencing factor) that may increase the actual sentence imposed *within* that maximum is not subject to the same requirements."

*Id.* at 156 n. 5. *See United States v. Fields,* 242 F.3d 393, 395 (D.C.Cir.2001); *United States v. Nance,* 236 F.3d 820, 824–25 (7th Cir.2000); *United States v. Hishaw,* 235 F.3d 565, 574–75 (10th Cir.2000); *United States v. Doggett,* 230 F.3d 160, 164–65 (5th Cir.2000); *United States v. Rogers,* 228 F.3d 1318, 1327 (11th Cir.2000); *United States v. Rebmann,* 226 F.3d 521, 524–25 (6th Cir.2000); *United States v. Nordby,* 225 F.3d 1053, 1058–59 (9th Cir.2000).[12]

---

**12.** The United States Supreme Court recently reached a similar conclusion in *United States v. Cotton,* —- U.S. ——, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (suggesting without deciding that, because the fact of drug quantity increased the statutory maximum sentence, it had to be

The finding of the statutory predicates for sex offender registration is much more akin to the finding, in *Behrman*, of the statutory predicates for restitution than to the finding of a specific drug threshold quantity in *Promise* because the statutory sentence given to the defendant in *Promise* after the court found the requisite drug quantity (thirty years) was greater than the maximum that otherwise would have been available absent that finding (twenty years). That is simply not the case here.[13]

---

alleged in the indictment, pursuant to *Apprendi* and *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224 n. 6, 143 L.Ed.2d 311 (1999)).

13. We recognize that any claim that petitioner might have asserted as a result of Internet notification would not have been ripe for adjudication prior to the Department of Public Safety and Correctional Service's recent dissemination of the registry over the Internet. *See Artway v. Attorney Gen. of New Jersey*, 81 F.3d 1235, 1250–51 (3d Cir.1996). Nonetheless, the petition for certiorari in the case *sub judice* raised only the issue of whether the registration statute was a punitive one, triggering the criminal due process protections of *Apprendi*, and not the issue of whether registration and notification under the statute meet the requirements of civil due process pursuant to the balancing test enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and its progeny. We do not, therefore, address the issue of whether the Due Process Clause of the Fourteenth Amendment requires a particularized risk assessment of each registrant, pursuant to specific procedures, to determine which statutorily eligible offenders pose a risk to the community prior to registration, notification, and Internet dissemination. *Cf. Doe v. Attorney Gen.*, 426 Mass. 136, 686 N.E.2d 1007, 1014 (1997) ("[A registrant] is entitled to a hearing and a determination as to ... whether sex offender information concerning him should be available on request.").

Our conclusion that § 792 is not punitive and does not violate the strictures of *Apprendi* should not be construed as holding that the sex offender registration and community notification statute does not violate due process in any way, particularly in light of the newly initiated Internet notification, which threatens widespread disclosure of highly personal data and may implicate social ostracism, loss of employment opportunities, and possibly verbal and physical harassment. It is arguable that widespread Internet community notification stigmatizes registrants and implicates liberty and privacy interests that would satisfy the "stigma plus" test utilized to analyze civil due process challenges in many of the federal circuits, therefore requiring certain procedural due process protections beyond those provided in the statute prior to community notification. *See, e.g., Noble v. Board of Parole and Post–Prison Supervision*, 327 Or. 485, 964 P.2d 990 (1998) (holding that

### III. Evidentiary Issues

In addition to his *Apprendi* argument, petitioner also raises two evidentiary challenges. He argues that the trial court abused its discretion in admitting evidence regarding his instructions to Jessica to avoid black customers, because they were "meaner" and more likely to rob her. Petitioner argues that evidence of his negative attitude toward African–Americans was not relevant and that the potential for prejudice far outweighed the probative value. He argues that there was sufficient evidence to establish that petitioner intended to make Jessica a prostitute, so that the evidence about petitioner's advice to avoid African–American customers was far less probative than prejudicial.

Petitioner also argues that the trial court erred in admitting evidence as to why Jessica agreed to become a prostitute, her difficult home life, and her concern for her sister's well-being after her arrest. He argues that such evidence was highly prejudicial, not relevant, and served only to generate sympathy for Jessica and make petitioner look immoral and blameworthy.

Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

---

the parole board's designation of an individual as a "predatory sex offender" for the purpose of the Oregon community notification statute implicated a liberty interest entitling a sex offender, as a matter of procedural due process, to notice and a hearing prior to designation); *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989) (recognizing a privacy right in the "individual interest in avoiding disclosure of personal matters," even if such information is available in public records); *Paul v. Davis*, 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *Doe*, 686 N.E.2d at 1013–14 (discussing privacy interests in information that is publically available); Wayne A. Logan, *Liberty Interests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws*, 89 J.Crim. L. & Criminology 1167, 1176 n. 45 (1999); *see generally Shields v. Burge*, 874 F.2d 1201, 1209 (7th Cir.1989) (referring to privacy interests in "confidentiality" and "autonomy").

more probable or less probable than it would be without the evidence." This Court reviews a trial court's determination of relevance under an abuse of discretion standard. *See, e.g., Ware v. State,* 360 Md. 650, 672–73, 759 A.2d 764, 775–76 (2000). Trial courts have wide discretion in determining the relevance of evidence. *See id.*

 Petitioner's statements regarding avoiding African–American customers did not constitute improper appeals to racial prejudice. The State was required to prove that petitioner knowingly brought Jessica into Maryland for the purposes of prostitution. Petitioner's instructions to Jessica as to how she should behave as a prostitute were highly probative of the *mens rea* of the charged offense, including his instructions as to which customers to approach and which ones to avoid. The evidence relating to Felicia's location in the motel room in Maryland was relevant to establishing the petitioner's transportation of Jessica within Maryland for the purposes of prostitution. The fact that such evidence incidentally may have engendered sympathy for Jessica is not error. The trial court did not abuse its discretion in admitting this evidence.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.*

BELL, C.J., and ELDRIDGE, J., dissent.

BELL, Chief Judge, dissents, in which ELDRIDGE, J. joins.

I disagree with the majority's conclusion that Maryland's sex offender registration statute does not constitute punishment. The statute is, first of all, much more than a registration statute; rather it also contains broad, virtually unlimited, community notification provisions. Specifically, and particularly in light of its community notification provisions, I am persuaded that the punitive effect of the statute outweighs, and negates, any remedial purpose it has. I would hold, therefore, that registration pursuant to the sex offender registration statute constitutes punishment and, further, because

the proof required for the court to order a defendant to register does not fall within the exception, established by *Apprendi v. New Jersey*, 530 U.S. 466, 487–88, 120 S.Ct. 2348, 2361–62, 147 L.Ed.2d 435, 453–55 (2000), for the proof of the fact of prior conviction, that the relevant factual predicate to registration must be presented to a jury, which must make the determination beyond a reasonable doubt. Accordingly, I dissent.

## I.

Jessie Lee Young, the petitioner, was convicted, pursuant to Md.Code Article 27, § 432 (1957, 1996 Repl.Vol., 2000 Supp.),[1] of transporting, for prostitution purposes, the victim in this case, who was under eighteen years old. A separate statute, Md.Code art. 27, § 792 (1957, 1996 Repl.Vol., 1998 Supp.),[2] requires defendants convicted of certain enumerated offenses, including § 432, and ordered by the court to do so, *see* § 792(a)(6)(vii), to register as sex offenders. § 792(c). For his conviction, the petitioner was sentenced to ten years imprisonment, the maximum, with all but eight years suspended and five years supervised probation on release, a condition of

---

**1.** Article 27, § 432 was repealed and re-enacted by 2001 Md. Laws 674. *See* Md.Code art. 27, § 428 (2001 Supp.). Section 432 provided:

"Any person who shall knowingly transport or cause to be transported or aid or assist in obtaining transportation for, by any means of conveyance, through or across this State, any person for the purpose of prostitution, or with the intent and purpose to induce, entice or compel the person to become a prostitute, shall be deemed guilty of a felony, and upon conviction thereof shall be imprisoned for not more than ten years; any person who may commit the crime in this section mentioned may be prosecuted, indicted, tried and convicted in any county or city in or through which he shall so transport or attempt to transport the other person."

**2.** Md.Code art. 27, § 792 (1957, 1996 Repl.Vol., 1998 Supp.) was repealed and reenacted by 2001 Md. Laws, ch. 10, § 2, effective October 1, 2001, and codified at Md.Code §§ 11–701–11–702 and 11–703–11–721 (1957, 1996 Repl.Vol., 1998 Supp.). By Md. Laws, ch. 221, also effective October 1, 2001, § 11–702.1, pertaining to the retroactive application of the registration law, was added.

which, consistent with the state's request, was that he "register as a sexual offender."[3]

In *Apprendi,* the United States Supreme Court held that, under the Fourteenth Amendment to the United States Constitution, " 'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " 530 U.S. at 476, 120 S.Ct. at 2355, 147 L.Ed.2d at 446 (quoting *Jones v. United States,* 526 U.S. 227, 243, n. 6, 119 S.Ct. 1215, 1224 n. 6, 143 L.Ed.2d 311, 326 n. 6 (1999)). There, Apprendi pled guilty to two counts of second degree possession of a firearm for an unlawful purpose. 530 U.S. at 469, 120 S.Ct. at 2351, 147 L.Ed.2d at 442. Under New Jersey's "hate crimes" law, a trial court could impose an extended period of imprisonment if it found by a preponderance of the evidence that the defendant acted with the purpose to intimidate an individual or group based on an impermissible bias. *Id.* at 469–70, 120 S.Ct. at 2351–52, 147 L.Ed.2d at 442–43. Finding that the defendant acted out of racial bias, the trial court imposed a twelve year sentence, which was two years greater than the maximum for a second degree firearms possession offense. The Supreme Court reversed, basing its holding on the Due Process Clause of the Fourteenth Amendment and the jury trial guarantee of the Sixth Amendment: "taken together, these rights indisputably entitle a criminal defendant to a 'jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a

---

**3.** The transcript of the sentencing reflects that the court sentenced the petitioner as follows:

"It is the judgment and sentence of this Court that you, Jessie Lee Young, be committed to the custody of the Commissioner of Corrections to be confined under this jurisdiction for a period of ten years. You are to be given credit for 246 days that you have already served. And the Court is going to suspend all but eight years, and when are released, you are placed on five years supervised probation.

"Part of that probation, sir, you must register as a sexual offender, you are to have no contact with the victim in this case, Jessie McGregor, and her sister, Felicia Green. You are to take whatever psychological treatment as required by your probation officer, and you are to pay the cost of these proceedings."

reasonable doubt.' *Id.* at 476–77, 120 S.Ct. at 2355–56, 147 L.Ed.2d at 447. The Court added:

> "If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to the proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached."

*Id.* at 484, 120 S.Ct. at 2360, 147 L.Ed.2d at 451.

Although denominated a Registration of Offender Statute, § 792 is a great deal more; it is, as well, a community notification statute and a very broad one, at that. *See* § 792(g) and (j).

As we have seen, an "offender" must register with his or her "supervising authority,"[4] if he or she violates one of the enumerated statutes and is ordered by the court to do so. *See* § 792(a)(6).[5] For an offender sentenced in this State, that means on or before the date of release, or sentence, when the sentence results in immediate release. *See* § 792(c)(1)(i).[6] An

---

**4.** The meaning of the term "Supervising authority" varies depending upon the offender's sentence and where he or she is housed or by whom supervised. Thus, the supervising authority may be the Secretary of the Department of Public Safety and Correctional Services, the administrator of a local detention center, the sentencing court, the Director of Parole and Probation, the Director of the Patuxent Institution, the Secretary of Health and Mental Hygiene, and the like. *See* § 792(a)(13).

**5.** Although "offender" is included within the definition of "registrant" and a registrant is required to register with the supervising authority upon certain occurrences, without any mention of a court order, given the specific requirement of a court order in § 792(a)(6), it appears that it is the court order that triggers the registration, not the mere qualification as an offender.

**6.** Failure to register is a separate misdemeanor. Section 792(*l*) provides:

> "A registrant who knowingly fails to register or knowingly provides false information of a material fact as required by this section is

offender must register annually for ten years, *see* § 792(d), each year signing and returning the verification form sent to him or her by the Department of public Safety and correctional Services (hereinafter "the Department"). *See* § 792(h)(3).[7] The offender, like all registrants, is required to send the Department written notice of his or her change of residence, within 7 days of the change occurring. *See* § 792(c)(3). The registration statement shall be signed and dated and include the offender's name, address, a description of the crime for which he or she was convicted, the date of the conviction, the jurisdiction in which the conviction occurred, a list of any aliases used, and the offender's social security number. *See* § 792(e).[8]

Besides the registration requirements, the statute also contains provisions for giving notice to certain agencies, persons and the public. The supervising authority must send a copy of the registration statement, the registrant's fingerprints, and a photograph of the registrant to the local law enforcement

---

guilty of a misdemeanor and on conviction is subject to imprisonment in the penitentiary for not more than 3 years or a fine of not more than $5,000 or both."

7. For persons in other statuses, the registration period may be for life and require more frequent registration than annually:
 "(5) The term of registration is:
 * * * *
 "(ii) life if:
 "1. The registrant has been determined to be a sexually violent predator in accordance with the procedures described in subsection (b) of this section;
 "2. The registrant has been convicted of a violation of any of the provisions of §§ 462 through 464 B of this article; or
 "3. The registrant has been previously required to register and has been convicted of any offense listed in subsection (a)(2)(6), or (11) of this section."
 § 792(d)(5). A sexually violent predator must register every 90 days. § 792(d)(4).

8. Where the registrant is a non-resident child sexual offender, offender, sexually violent offender or sexually violent predator, in this State for employment or educational purposes, *see* § 792(a)(7), this information also must include the registrant's place of employment or "place of educational institution or school enrollment."

agency in the county or counties where the registrant will reside, work, or attend school. *See* § 792(f)(3). When the supervising authority is not a unit of the Department, it also must, within that five day period, send the registration statement to the Department, which is required to maintain a central registry. *See* § 792(h)(1)(i). The local law enforcement agency is then required, when the offender resides in a municipality that has a police department, to send the notice to the police department of the municipality.[9]

Section 792(j) addresses, *inter alia*, to whom copies of a registrant statement may be sent.[10] The supervising authority must send a copy of the registration statement to the last known address of certain persons who have requested, in writing, notice about a specific registrant: the victim, or, if a minor, the victim's parents or guardian; a witness who testified against the registrant in court proceedings; as well as "any individual specified in writing by the State's Attorney."

---

**9.** Section 792(g) contains provisions pertaining to the registration statements of child sexual offenders and sexually violent offenders. As to the former, in addition to sending notice to the Department, the local law enforcement agency "shall send written notice of the registration statement to the county superintendent of schools in the county where the child sexual offender will reside." *See* § 792(g)(1)(ii). The county superintendent, in turn, must send written notice of the registration statement "to those principals of the schools within the supervision of the superintendent that the superintendent considers necessary to protect the students of a school from a child sexual offender. *See* § 792(g)(2).

As to sexually violent predators, § 792(g)(3) provides:

"(3)(i) Every 90 days, the local law enforcement agency shall mail a verification form, which may not be forwarded, to the last reported address of a sexually violent predator.

"(ii) Within 10 days after receiving the verification form, the sexually violent predator shall sign the form and mail it to the local law enforcement agency.

"(iii) Within 5 days after obtaining a verification form from a sexually violent predator, a local law enforcement agency shall send a copy of the verification form to the Department."

**10.** Section 792(j)(1) defines what a registration statement consists of for purposes of this section: "a copy of the completed registration form and a copy of a photograph of the registrant, but need not include the registrant's fingerprints."

*See* § 792(3). In addition, upon a request from an individual containing the name and address of the individual submitting the request and the reason for requesting the information, a local law enforcement agency shall send one copy of the registration statement of each child sexual offender and each sexually violent predator and may send a registration statement on file with the agency of registrants who are neither child sexual offenders or sexually violent predators. Moreover, "In addition to the notice required under subsection (g)(1)(ii) of this section, the Department and a local law enforcement agency shall provide notice of a registration statement to any person that the Department or local law enforcement agency determines may serve to protect the public concerning a specific registrant if the Department or the agency determines that such notice is necessary to protect the public." *See* § 792(7)(i).[11] Section 792(6) provides:

> "(6) The Department shall release registration statements or information concerning registration statements to the public and may post on the Internet a current listing of each registrant's name, offense, and other identifying information, in accordance with regulations established by the Department."

As indicated, the petitioner was convicted of a violation of § 432, which carries a maximum sentence of ten years. He was ordered to register as a sexual offender as a condition of probation. There is, in addition, a separate statute prescribing registration by certain convicted persons under certain circumstances. The question that has been asked and, thus, must be answered is whether that additional requirement of registration, whether as a condition of probation or pursuant to the statute, is punishment. If it is, it seems clear to me that the petitioner's sentence has been enhanced and that, therefore, he was entitled to have the evidence on the basis of

---

11. The Department and local law enforcement agency is charged with establishing procedures for carrying out the notification requirements of this section. *See* § 792(7)(ii).

which the registration decision was made evaluated by a jury under the *Apprendi* standard.[12]

At the outset, the majority acknowledges that the court ordered registration as a condition of probation, but argues only that it was pursuant to § 792; it does not argue, as the trial court apparently believed, *see* n. 3, that the registration was consistent with its authority to fashion conditions of probation. That is not surprising, since conditions of probation clearly are punishment. *See Spielman v. State*, 298 Md. 602, 610, 471 A.2d 730, 735 (1984) ("It hardly can be contended that one who has been ordered to pay restitution, as a condition of probation, and is subject to revocation of that probation for failure to make payment, has not received punishment."). The trial court also ordered that the petitioner obtain psychological treatment. Under the majority's view, that also is not punishment, presumably because it is intended to be remedial.

Turning to the statute, I do not take issue with the test the majority ultimately adopts, and applies, in this case, although the cases on the basis of which it was formulated arose in much different contexts. Indeed, I have found only one case directly on point, *see People v. Marchand*, 98 Cal.App.4th 1056, 120 Cal.Rptr.2d 687 (2002) and it, following the Supreme Court of California's lead, *see People v. Castellanos*, 21 Cal.4th 785, 88 Cal.Rptr.2d 346, 982 P.2d 211, 217 (1999),[13] as it had to,

---

**12.** The majority holds, in any event, that the registration requirement does not enhance the petitioner's sentence, as a matter of fact. 370 Md. at 716, 806 A.2d at 251. I do not agree. As we have seen, the maximum sentence for a violation of § 432 is ten years. That sentence does not include any registration requirement. Consequently, once it is determined that the registration statute is punitive, imposing a registration requirement pursuant to § 792 is additional punishment that enhances the maximum sentence for the underlying offense, whatever the amount of actual jail time imposed.

**13.** A majority of the court applied a test that considered "whether the Legislature intended the provision to constitute punishment and, if not, whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent," but declined to apply the multifactor test enunciated in *Kennedy*

applied a version of the "intent-effects" test for evaluating whether an act is punitive or remedial, concluding that sex offender registration does not constitute punishment or penalty within the meaning of the United States Supreme Court's decision in *Apprendi* under the due process clause of the Fourteenth Amendment. *Marchand,* 98 Cal.App. 4th at 1065, 120 Cal.Rptr.2d at 694. The Supreme Court of California held in *Castellanos* that, for ex post facto purposes, sexual offender registration was not punishment. 88 Cal.Rptr.2d 346, 982 P.2d at 218. It is significant that neither court expressed an opinion as to the community notification provisions of the statute. *Castellanos,* 88 Cal.Rptr.2d 346, 982 P.2d at 218, n. 6 ("It does not appear that defendant is subject to the public notification provisions of section 290, subdivisions (m) and (n), and section 290.4, and we express no opinion regarding the effect, if any, that application of those provisions would have upon our analysis."); *Marchand,* 98 Cal.App.4th at 1062, 120 Cal.Rptr.2d at 692 ("it does not appear defendant here is subject to the public notification provisions of the sex offender registration statutes.... Thus, we need not address defendant's argument that sex offender registration constitutes punishment because it 'obviously carries substantial societal stigma.' ")

## II.

The majority asserts that "[n]umerous courts have discussed the issue of whether the registration and notification provisions of sex offender registration statutes ... constitute punishment," 370 Md. 686, 697, 806 A.2d 233, 239 (2002), concluding that "[t]he overwhelming body of this judicial precedent concludes that sex offender registration under these types of statutes is not punishment." *Id.* at 697, 806 A.2d at

*v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), for determining whether a nominally civil penalty should be reclassified as criminal, had to be applied in the ex post facto context, *People v. Castellanos,* 21 Cal.4th 785, 88 Cal.Rptr.2d 346, 982 P.2d 211, 217 (1999), which is the test a minority of the court would have applied.

239. This suggestion that there is a strong consensus on this issue is misleading.

Although the numerous state statutes do share certain general characteristics, several aspects of their administration, their registration requirements, and, particularly, their community notification provisions, vary considerably. *See generally* Stephen R. McAllister, *Megan's Laws: Wise Public Policy or Ill–Considered Public Folly?*, 7 Kan. J.L. & Pub. Pol'y 1, 17 (1998). For example, while some states limit disclosure to law enforcement, *see, e.g., State v. Noble,* 171 Ariz. 171, 829 P.2d 1217, 1219 (1992)(At the time of registering, the person shall sign a statement in writing giving such information as required by the director of the department of public safety. The sheriff shall fingerprint and photograph the person and within three days thereafter shall send copies of the statement, fingerprints and photographs to the criminal identification section within the department of public safety and the chief of police, if any, of the place where the person resides); *State v. Costello,* 138 N.H. 587, 643 A.2d 531, 533 (1994) (The sexual offender reports his or her current address annually to local law enforcement agency, which forwards it to the State Police for entry in the law enforcement name search system and is held confidential within the law enforcement community, with local law enforcement agencies being notified when the offender or permit public disclosure only on the basis of an individualized assessment of the risk of recidivism.), *see Artway v. Attorney of the State of New Jersey,* 81 F.3d 1235, 1243–44 (3rd Cir.1996); *see also Doe v. Pataki,* 120 F.3d 1263, 1269–70 (2nd Cir.1997), or as necessary to protect the public concerning a specific registrant, *e.g., Cutshall v. Sundquist,* 193 F.3d 466, 469 (6th Cir.1999), others have posted all sex offenders' information on the Internet. *See, e. g., Doe v. Otte,* 259 F.3d 979 (9th Cir.2001), *cert. granted,* —— U.S.——, 122 S.Ct. 1062, 151 L.Ed.2d 966 (2002). Because Maryland's sex offender registration statute permits broad public disclosure but does not provide for an individualized risk assessment, the majority's reliance on cases upholding more narrowly tailored statutes is misplaced.

Moreover, although many courts have determined that registration requirements and notification of law enforcement do not constitute punishment, far fewer have examined the closer issue of whether community notification does. *See, e.g., Castellanos, supra,* 88 Cal.Rptr.2d 346, 982 P.2d at 218; *Marchand, supra,* 98 Cal.App.4th at 1062, 120 Cal.Rptr.2d at 692; *Artway, supra,* 81 F.3d at 1248; *Burr v. Snider,* 234 F.3d 1052 (8th Cir.2000) (declining to rule, on habeas corpus, on the constitutionality of the community notification provision of the registration statute, the issue not having been raised or decided by the State court). In fact, many of the decisions discussed by the majority predate the enactment of broad community notification provisions, which did not become widespread until the federal government expressly encouraged their adoption, or do not include analysis of the issue because the challenges brought were not yet ripe for consideration.

In *Artway,* for example, cited by the majority, the United States Court of Appeals for the Third Circuit declined to consider whether the community notification provisions of New Jersey's sex offender statute constituted punishment. *See* 81 F.3d at 1248. Whether the registrant's personal information would be publicly available depended on how he was classified under New Jersey's "Registrant Risk Assessment Scale," as well as on a future decision of the Prosecutor's Office. *Id.* The court reasoned that notification under the statute involved a contingency that rendered too speculative the prospect of hardship from the denial of review. Nonetheless, in discussing and, ultimately, upholding the statute's registration requirements, the *Artway* court frequently drew a distinction between the registration requirements and the notification provisions, making clear that whether the registration information would be made publicly available was a significant factor in determining whether the statute was punitive.[14]

---

14. Contrasting the notification provisions of the New Jersey statute with the registration requirements, the *Artway* court offered the follow-

Courts have been more likely to find the community notification provisions of a sexual offender registration statute punitive when those notification provisions permit, or mandate, broad public disclosure of registrant information. *See, e.g., Kansas v. Myers*, 260 Kan. 669, 923 P.2d 1024 (1996), *cert. denied*, 521 U.S. 1118, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997), is one of the earlier examples. Under the Kansas Sex Offender Registration Act, the community notification provisions authorized public inspection of sex offender records at police departments and contained no affirmative restrictions on dissemination. Thus, it permitted newspapers or others to disseminate the information as broadly as they pleased. The Kansas Supreme Court held the community notification provisions of the Kansas statute had a punitive effect and, therefore, was an unconstitutional ex post facto law. In reaching that result, it applied the factors formulated in *Kennedy v.*

---

ing explanation of why the challenge of the notification procedures was not ripe for judicial review:

"The notification procedures, on the other hand, involve dissemination of potentially devastating information to undetermined numbers of private citizens. Because these private citizens are not part of the trained state law enforcement mechanism, we are less certain how they will react. For instance, the one study in the record chronicles a number of incidents of harassment at the hands of private citizens as a result of the State of Washington's notification law, but records no incidents on the part of law enforcement. We also lack concrete record evidence about what [petitioner]'s future dangerousness classification will be, on what facts the classification will be determined, and who will be notified...."

81 F.3d at 1250. Disagreeing with the petitioner's argument that the registration requirements constituted punishment, the court emphasized that his notification challenge was not being decided, stating as follows:

"[Petitioner] marshals strong reasons that notification would have devastating effects. In addition to the ostracism that is part of its very design, notification subjects him to possible vigilante reprisals and loss of employment. And unlike the mere fact of his past conviction, which might be learned from an employment questionnaire or public records, notification under Megan's Law features the State's determination—based overwhelmingly on past conduct—that the prior offender is a future danger to the community. We reemphasize, however, that as forceful as [petitioner]'s arguments seem to be, the issue of notification is not ripe at this time."

*Id.* at 1266.

*Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), whether: (1) the sanction involves an affirmative disability or restraint; (2) it historically has been regarded as a punishment; (3) it requires a finding of scienter; (4) its operation will promote the traditional aims of punishment-retribution and deterrence; (5) the behavior to which it applies is already a crime; (6) it lacks an alternative purpose to which it rationally may be connected; and (7), the statute appears excessive in relation to an existing alternative. *Id.,* at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d at 661.

As to the first factor, holding that the registration provisions did not constitute punishment, *Myers,* 260 Kan. at 695, 923 P.2d 1024, the court addressed the community notification provisions, concluding:

"However, we must also consider the provision in K.S.A. 22–4909 that the registered information is open to public inspection in the sheriff's office. Although 22–4909 does not impose any affirmative dissemination requirements on the authorities, it imposes no restrictions on anyone who inspects the information. The information could be routinely published in the newspaper or otherwise voluntarily disseminated by anyone. The practical effect of such unrestricted dissemination could make it impossible for the offender to find housing or employment. We find that the KSORA public disclosure provision does impose an affirmative disability or restraint. Unrestricted public access to the registered information leaves open the possibility that the registered offender will be subjected to public stigma and ostracism."

*Id.* at 695–96, 923 P.2d 1024.

The court also determined that the statute promoted both retribution and deterrence, explaining:

"Registration has an obvious deterrent effect. A registered offender is more likely to think twice before committing another sex offense when the person knows that the local sheriff already has the offender's name on a list. We acknowledge the statement in *[United States v.] Ursery,* [518 U.S. 267, 292, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549,

570 (1996) ], that "the purpose of deterrence ... may serve civil as well as criminal goals." The stigma that will accompany public exposure of the registered information could be viewed as a form of retribution. We find that the KSORA public disclosure provision may have both a deterrent and retributive effect. However, the nonpunitive purpose of the statute cannot be accomplished without informing the public that a sex offender is in its midst. If the statute limited public disclosure to that necessary to protect the public, then its deterrent effect could be viewed as incidental to its nonpunitive purpose. Unlimited public access to the registry provides a deterrent or retributive effect that goes beyond such purpose."

*Id.* at 696, 923 P.2d 1024.

To the court, however, "the excessive scope of public disclosure of registered information" was the key factor in its determining that the community notification provisions were punitive. *Id.* at 696–97, 923 P.2d 1024. Recalling the specter of "that most famous badge of punishment: the *Scarlet Letter,*" *id.* at 697, 923 P.2d 1024 (quoting *Artway,* 81 F.3d at 1255,) in which it was observed: "There can be no outrage ... against our common nature,—whatever be the delinquencies of the individual,—no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do," (quoting Nathaniel Hawthorne, *The Scarlet Letter* 63–64 (Random House 1950)), it held:

"For Myers, KSORA's disclosure provision must be considered punishment. We hold that the legislative aim in the disclosure provision was not to punish and that retribution was not an intended purpose. However, we reason that the repercussions, despite how they may be justified, are great enough under the facts of this case to be considered punishment. The unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety."

*Id.* at 699, 923 P.2d 1024.

More recently, in *Doe v. Otte, supra,* the 9th Circuit found punitive the Alaska Sex Offender Registration Act. That stat-

ute required convicted sex offenders to register with law enforcement authorities and authorized public disclosure of information in the sex offender registry. Implementing regulations provided that Alaska would, in all cases, post the information from the registry for public viewing in print or electronic form, so that it can be used by "any person" "for any purpose." Alaska Admin. Code tit. 13, § 09.050(a) (2000). Thus, like the Kansas statute, the Alaska law allowed unrestricted public access to the registration information, regardless of risk, by providing for posting the sex offender's name, physical description, street address, employer address, and conviction information, along with a color photograph, on the State's Department of Public Safety website on the Internet. Applying the *Mendoza–Martinez* test, the court held:

"the effects of the specific provisions of the Alaska Act provide the 'clearest proof' that, notwithstanding the legislature's non-punitive intent, the statute must be classified as punitive for Ex Post Facto Clause purposes. Four of the seven factors favor this result.[15] Two factors, particularly, demonstrate that the effect of this particular statute is to increase the penalty the law provided at the time Doe I and Doe II's offenses were committed. First, there is the substantial disability imposed by the Act. The registration provisions, which require in-person registration at a local police station where registrants must provide detailed information four times each year for life in the case of some defendants, and annually for 15 years in the case of others, are extremely burdensome. This disability is exacerbated by the public notification provisions that plaintiffs' uncontradicted evidence demonstrates exposes all registrants to world-wide obloquy and ostracism. Second, unlike the sex offender registration and notification statutes upheld by the Second, Third and Sixth Circuits, as well as by this Circuit in *Russell,* the Alaska statute is excessive in relation to its non-punitive purpose. An offender cannot escape the Act's

---

**15.** The three factors favoring a finding that it was non-punitive were historical treatment, scienter and there being a non-punitive alternative.

grasp no matter how clearly he may demonstrate that he poses no future risk to anyone, and no matter how final the judicial determination that he has been successfully rehabilitated; in short, under the Alaska statute, the requirements relating to disclosure of a past offense are not related to the risk posed. Furthermore, that the Act applies only to offenders who have been convicted of committing a crime and that it serves retributive and deterrent ends [ [16]] provides additional support for our conclusion that the Alaska statute is punitive."

*Id.* at 993–94 (citing *Hendricks, Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 2082, 138 L.Ed.2d 501, 515 (1997)) (footnote omitted).

Other courts have expressed concern regarding the broad dissemination of sex offender registry information. In *Doe v. Attorney General,* 425 Mass. 217, 680 N.E.2d 97 (1997), the Supreme Judicial Court of Massachusetts reviewed an injunction against enforcement of that State's sex offender registration statute. The statute provided:

"Any person who is eighteen years of age or older, upon the verification of his age and identity, shall receive at no cost from the [criminal history systems board] a report which indicates whether an individual identified by name, date of birth or sufficient personal identifying characteristics is a sex offender as defined in section one hundred and seventy-eight C, the offenses for which he or she was convicted or adjudicated, and the dates of said convictions or adjudications. Any records of inquiry shall be kept confidential; provided, however, that the records may be disseminated to assist any criminal prosecution."

---

**16.** The bases on which the court determined that the Alaska statute was retributive were the Act's onerous registration obligations, specifically, the duration of the Act's reporting requirement. Requiring the sex offenders to report quarterly to their local police stations may be analogized, the court opined, to the duty imposed on other defendants, after conviction, to report regularly to a probation officer or to comply with the conditions of supervised release. The registration duration of fifteen years applies to even non-aggravated offenses.

Despite a disclaimer in the law,[17] the court upheld the injunction, observing that the statute "contained no explicit remedial or regulatory purpose. Any adult, merely by presenting identification, may obtain sex offender registry information from the board for any reason or for no reason at all. The ... disclosures under § 1781 are not limited to serving some worthy public purpose." *Id.* at 99. Turning to the question whether disclosure of the plaintiff's sex offender registry information imposed punishment in a constitutional sense, the court rejected the State's argument that there is no evidence that the plaintiff would be harmed by the disclosure, pointing out:

"The possibility exists, however, that a person with no remedial motive will obtain sex offender registry information and reveal it to the plaintiff's detriment. The potential harm to the plaintiff in his employment or in his community, or both, from the use of such information for other than personal protection is substantial. Once the plaintiff is harmed, at best it will not easily be remediable."

*Id.* at 100.

A similar concern is reflected in the due process challenge to Internet posting mounted in *Doe v. Lee,* 132 F.Supp.2d 57 (D.Conn), *aff'd, Doe v. Dep't of Pub. Safety,* 271 F.3d 38 (2nd Cir.2001), *cert. granted Conn. Dep't of Pub. Safety v. Doe,* —— U.S. ——, 122 S.Ct. 1959, 152 L.Ed.2d 1020 (2002). Pursuant to Connecticut's sex offender registry act, registry information is required to be made available to the public in a number of ways: at the central registry during regular business hours; at local law enforcement agency offices during business hours; and over the Internet. In addition, the Department of Public Safety must annually remind the State's media that the regis-

---

17. The statute also provided:

"All reports to persons making inquiries shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender and the punishment for threatening to commit a crime under the provisions of section four of chapter two hundred and seventy-five."

try exists and provide them with information on how to access it. The database containing the registry information is uncategorized, that is, not differentiated on the basis of individual dangerousness.[18] The court found the plaintiff's due process claim meritorious, explaining:

> "Plaintiff prevails on the due process claim because the State has not provided him with any opportunity to challenge the stigmatizing allegation, implied by his inclusion in the publicly available registry, that he is a dangerous sex offender. The implied allegation, which plaintiff contends is false, arises from the undifferentiated nature of the registry, in which dangerous and nondangerous registrants are grouped in a single classification and no information is provided regarding any registrant's dangerousness. Because there can be no doubt that some registrants are dangerous, Connecticut's single classification falsely suggests that nondangerous registrants are a threat to public safety. In addition to falsely stigmatizing nondangerous registrants, the CT–SORA alters their legal status under state law."

*Id.* at 62 (footnote omitted). *But see Femedeer v. Haun*, 227 F.3d 1244 (10th Cir.2000), (upholding the Utah sex offender registration and notification statute, which, like the Alaska statute, makes the state's entire sex offender registry accessible on the Internet). *Id.* at 1247–48.[19]

### III.

The majority adopts the "intent-effects" analysis gleaned from *Hendricks* and *United States v. Ursery*, 518 U.S. 267, 288, 116 S.Ct. 2135, 2147, 135 L.Ed.2d 549, 568 (1996), which

---

**18.** According to the court, "By undifferentiated [it] mean[t] a system like Connecticut's, which places all registrants in one class for notification purposes—'sex offender'—without attempting any individualized assessment of their dangerousness or likelihood of reoffense. One commentator has termed systems without individualized risk assessment 'compulsory' registries." *Doe v. Lee*, 132 F.Supp.2d at 59 n. 3.

**19.** Unlike the Alaska statute, the Utah database does not include employer names and addresses. *See id.* at 1247.

incorporates the *Mendoza–Martinez* factors. In its applica-
tion of the *Mendoza–Martinez* factors to Maryland's Regis-
tration of Offenders statute, the majority concedes that it im-
poses an affirmative restraint on registrants, stating that
"particularly in light of the community notification provisions
. . . [b]eing labeled as a sexual offender within the community
can be highly stigmatizing and can carry the potential for
social ostracism." 370 Md. at 713, 806 A.2d at 249. The
majority also concedes that the statute applies to behavior
that is already a crime, *see id.*, and acknowledges that it
promotes deterrence. *Id.* at 715, 806 A.2d at 250. Nonethe-
less it concludes that the statute is "not excessive in relation
to its remedial purpose," *id.*, concluding that it "serves the im-
portant nonpunitive goal of alerting law enforcement and the
community to the presence of sexual predators who may
reoffend." *Id.* It reasons that the statute's provisions "are
narrowly tailored to effectuate the goal of protection of the
public from sex offenders." *Id.*

I am hard pressed to discern how the majority can suggest
that the statute is narrowly tailored. Unlike the statutes
involved in most of the cases relied upon by the majority,
Maryland's sex offender registration statute permits broad
public disclosure of registration information. In addition to
dissemination of the registration statements to local enforce-
ment agencies, for further dissemination, in the case of certain
registrants, to the County school superintendents, and to the
Department as the Central depositary, the supervising author-
ity must send a copy of the registration statement to certain
persons, including the victim, a witness who testified against
the registrant, and "any individual specified in writing by the
State's Attorney." *See* § 792(j)(3). In addition, it must meet
the requests under § 792(j)(5)(i)(1) and may comply with those
under § 792(j)(5)(i)(2). The Department or any local law
enforcement agency, when they determine it to be necessary
to protect the public, is required to give notice of a registra-
tion statement to anyone that they determine may serve to
protect the public concerning a specific registrant. *See*
§ 792(7)(i). And, as we have seen, "[t]he Department shall

release registration statements or information concerning registration statements to the public and may post on the Internet a current listing of each registrant's name, offense, and other identifying information, in accordance with regulations established by the Department." *See* § 792(6). During the pendency of this decision, the Department has begun posting registration information on the Internet. This information includes the registrant's name, picture—if available, exact home address, category of offense, and a description of his crime.

This is very broad community notification. In fact, it is reminiscent of the broad notification provisions found to be punitive in *Myers* and *Otte*. The reasoning of *Myers* and *Otte*, therefore, apply with equal force to this case. While our statute may not be so broad as either of the statutes invalidated in those cases, it comes closer to them than to any other statute to which the Court has been referred or of which I am aware, save one: *Femedeer v. Haun, supra,* by whose reasoning, I simply am not persuaded.

Like the Kansas Supreme Court and the 8th Circuit, I am satisfied that the Maryland sex offender statute imposes an affirmative disability on the registrants, promotes retribution and deterrence, and is excessive in relation to its remedial purpose. Critical to this conclusion is the breadth of the community notification provisions. It is that which causes the affirmative disability or restraint. As the majority recognizes, deterrence is an impact of registration. The Supreme Court of Kansas is correct, however, in recognizing that broad community notification may give the statute a retributive effect. And when there are virtually no restrictions on the dissemination of the registration statements, there is little relation, or effect, to the remedial purpose of the statute. I would hold, applying the "intent-effects test," [20] as does the

---

**20.** I assume, without deciding that the legislative intent in enacting the sex offender registration statute was not punitive, but remedial. It should be noted, however, that there are significant indicia that suggest the contrary. As the petitioner points out, the statute was codified in

majority, and adopting the reasoning of *Myers* and *Otte,* that § 792 is punitive.

In the case *sub judice,* petitioner's classification as an offender was governed solely by the definition of "offender" in § 792(a)(6), which turned only on his conviction for an enumerated crime, involving a victim under the age of eighteen and the fact that the court ordered the registration. We have no idea, because the trial judge did not make an explicit finding on the record, as to why the petitioner was ordered to register as an offender. It may have been because of the victim's age, but it may have been for some other, less obvious reason. All we know for sure is that the trial court sought to impose as a condition of probation that the petitioner register as a sex offender.[21] In any event, whatever the basis for the court's order requiring petitioner to register, I submit that basis should have been proved beyond a reasonable doubt. At the very least, that would consist of the victim's age.

I would reverse the judgment of the Court of Special Appeals.

Judge ELDRIDGE joins in the views herein expressed.

---

the criminal code and recodified in the criminal procedure code. Also the legislative history, because great pains were taken by its sponsors to insulate the statute from an ex post facto challenge, is supportive of a statute that is punitive.

21. Section 432 does not require proof of the age of the person transported as an element of the crime. The petitioner very well could have been convicted even if the jury believed the victim was older or accepted his defense that he thought she was older. Thus, there is force to the petitioner's argument that whether the victim was under eighteen was before the jury a disputed, albeit largely objective, fact in this case. The determination of that "fact" was not submitted to the jury for decision beyond a reasonable doubt. Although the jury convicted petitioner of transporting a person for the purposes of prostitution, the jury was presented with conflicting evidence as to that person's age and the issue was never presented to the jury for a finding of fact.